**HIGHWAY TRUCK DRIVERS AND HELPERS, LOCAL 107, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 16429.**

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 2, 1962.

Decided April 27, 1962.

Petition for Rehearing Denied May 21, 1962.

Mr. Richard H. Markowitz, Philadelphia, Pa., of the bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of court, with whom Mr. Herbert S. Thatcher, Washington, D. C., was on the brief, for petitioner. Mr. Donald M. Murtha, Washington, D. C., also entered an appearance for petitioner.

Miss Marion Louise Griffin, Attorney, National Labor Relations Board, of the bar of the Supreme Court of Ohio, pro hac vice, by special leave of court, with whom Messrs. Stuart Rothman, General Counsel, National Labor Relations Board, Dominick L. Manoli, Associate General Counsel, National Labor Relations Board, and Marcel Mallet-Prevost, Assistant General Counsel, National Labor Relations Board, were on the brief, for respondent. Mr. Herman M. Levy, Attorney, National Labor Relations Board, also entered an appearance for respondent.

Before WILBUR K. MILLER, Chief Judge, and BASTIAN and BURGER, Circuit Judges.

WILBUR K. MILLER, Chief Judge.

E. A. Gallagher & Sons, a partnership having its principal office in Philadelphia, is and for some years has been a common carrier by motor vehicle operating in a number of states. It also maintains warehouses and marine terminals. For the operation of its local and long distance service, Gallagher employs drivers and helpers who are members of the Teamsters Union. Its warehousemen and their helpers are not members of or represented by the Union. In addition, Gallagher frequently engages independent contractors, who own and operate their own truck tractors, to transport freight from other points to the Philadelphia area and deliver it to the consignees or to a Gallagher terminal or warehouse; these owner-operators are not members of the Union and are not represented by it.

A number of trucking companies in the Philadelphia area whose employees are represented by the Teamsters Union have organized the Motor Transport Labor Relations, a corporation, to bargain and contract with the Union in their behalf. The contract between this employer organization and the Union is referred to as the "master" agreement. More than four hundred trucking companies, including Gallagher, who do not belong to the MTLR but whose drivers are represented by the Union, are regularly asked by the latter to sign letters agreeing to be bound by the so-called master agreement, insofar as its terms are applicable.

On December 21, 1959, the Union sent Gallagher a form letter which contained the following:

"We are in the process of negotiating the wages, hours and working conditions to become effective January 1, 1960 and thereafter with Motor Transport Labor Relations, Inc. Because time is so short and because we desire to conclude our agreement with employers such as yourself who are not members of MTLR, we are asking you to agree to the following wages, hours and working conditions effective January 1,

1960 and thereafter which will be contained in the new agreement:

\* \* \* \* \* \*

"We are asking you to agree to these wages, hours and working conditions in order to continue our collective bargaining relationship without interruption after the expiration of our contract. Of course if our master negotiations result in any different changes in our existing collective bargaining agreement with you, your signature to this letter will indicate your approval of such different changes. In other words, you are agreeing herein to effectuate the changes in our current collective bargaining agreement which will be the same as the changes applicable to all employers in the area."

Thus the Union was asking Gallagher to agree in advance, and without knowledge of their contents, to any provisions which might thereafter be incorporated in its contract with MTLR, to which Gallagher was not to be a party. Gallagher replied that it would conform to the wage rates and "hourly standards" established by the new master contract, but would not agree to the other terms of the form letter because it could then be required to stop doing business with owner-operators.

This apprehension was based upon the following provisions of the Union-MTLR contract which was in effect from January 1, 1957, to December 31, 1959, on the basis of which the Union struck against Gallagher on January 2, 1957, in an effort, as a Trial Examiner subsequently found, to force it to cease dealing with independent owner-operators:

"Article VII *Local Area Protection* All local area operation work which in the past, MTLR, Operator and a particular Union agree should or was to be performed solely by employees covered by this Agreement shall be performed by employees represented by Union."

"Article XVII *Local Area Operations* Local area operations include

all work performed within the city of Philadelphia or within a radius of forty (40) miles from City Hall, Philadelphia."

"Article XXI *Leased or Hired Equipment* No Operator may lease or hire outside equipment to supplement his own equipment unless all of Operator's available, usable equipment is working. No outside driver shall be permitted to operate leased or hired equipment unless and until all available employees on the seniority list of Operator have been assigned to work in seniority order; this provision shall not apply to specialized equipment not normally driven by Operator's employees. When Operator leases or hires equipment with a driver, Operator shall give first preference to employers having a contract with a local of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America."

The Board's decision in this case so describes the 1957 strike and adds that "that dispute between Gallagher and Local 107 ended with the issuance of the Trial Examiner's Intermediate Report, to which no exceptions were filed. The parties subsequently entered into a separate contract effective until December 31, 1959." To this statement the Board appended the following footnote:

"As the events in this prior case occurred outside the 6 months limitation period of Section 10(b) of the Act, we rely on them for background purposes only. Local 1424, International Association of Machinists, AFL-CIO v. N. L. R. B. (Bryan Manufacturing Co.), 362 U.S. 411 [80 S.Ct. 822, 4 L.Ed.2d 832.]"

Although in this case the Union's negotiators said they were not interested in owner-operators and that the foregoing contract provisions would not be construed as forbidding the continued use of such independent contractors, it appears that the Union had not abandoned its effort in that regard and did not consider the banning of independents to be a closed issue.[1] Significantly, the three clauses above quoted from the 1957–1959 master agreement appear in the Union-MTLR contract effective from January 1, 1960, to December 31, 1962.

On January 4, 1960, the Union called a strike and established a picket line because Gallagher had not agreed to its letter of December 21. Three days later, Gallagher filed charges alleging the Union had been and was engaged in labor practices unfair to it by seeking to force it to partially cease doing business with the owner operators. Amended charges were filed January 8.

Negotiations continued. Gallagher offered to accept the letter of December 21, subject to certain conditions, and agreed to be bound by the MTLR contract where applicable, except where it might interfere with its use of independent owner-operators. The Union refused to give written assurance that it would not construe the contract as giving it the right to ban or restrict the use of such independents. Thereupon negotiations terminated.

1. In the cross-examination of the vice president and business agent of the Union, the following appears:

"Q. * * * Does that refresh your recollection because I believe you testified there that there were still matters open, including the issue of the utilization of owner-operators and that Local 107 was still trying to get MTLR to agree not to use them. A. I think we talked about that. Utilization of owner-operators has been open for 25 years and it will probably be open for 50 more. It is something that will never be a closed issue.

"Q. And are you constantly meeting, negotiating and dickering with MTLR concerning that problem? A. No, sir.

"Q. You are not? A. No, sir.

"Q. When did you abandon your efforts in that regard? A. We have never abandoned our effort. But it is the first 'no' we get in every contract negotiations that is practically the first item under the table."

In these circumstances, with Gallagher's charges pending before the Board, the Regional Director of the Board's Fourth Region late in January, 1960, sued the Union in the United States District Court for the Eastern District of Pennsylvania. He sought a preliminary injunction pursuant to Section 10 (*l*) of the Act, as amended, 29 U.S.C.A. § 160(*l*), pending the Board's final disposition of Gallagher's charges. The Union having answered, the court heard evidence and argument and made findings of fact, the pertinent portion of which we quote: [2]

"[4]  (g) For some time, and particularly since on or about December 21, 1959, respondent has been engaged in efforts to force or require Gallagher to partially cease doing business with the owner-operators, and to achieve that purpose has demanded that Gallagher sign a contract or otherwise be bound by this provision, with the intent of having respondent's Master freight industry contract changed to restrict Gallagher's doing business with such owner-operators:

" 'In other words, you are agreeing herein to effectuate the changes in our current collective bargaining agreement which will be the same as the changes applicable to all employers in the area.' * * *

"(h) Gallagher has refused to accede to the aforesaid demands of respondent on the ground that to do so would force or require Gallagher, in part at least, to cease or refrain from handling, transporting or otherwise dealing in products transported or to be transported by the owner-operators, or to cease doing business with owner-operators, since in most instances the owner-operators deliver directly to a consignee in the Philadelphia area, and to cease doing business with owner-

operators unless all Gallagher's usable equipment and drivers are working and unless preference is given to owner-operators having contracts with respondent or another local of respondent's international union.

"(i) In furtherance and support of its demands set forth in Finding of Fact 4(g) above, and to force or require Gallagher to comply with same, since on or about January 4, 1960, respondent has picketed Gallagher's terminal and warehouse facilities in the Philadelphia area.

"(j) In addition, since on or about January 4, 1960, respondent has ordered, directed, instructed and appealed to its members employed by Gallagher as over-the-road drivers, and as city drivers and helpers on an hourly basis, as set forth in Findings of Fact 4(e) and (f) above, to refuse in the course of their employment to perform services for Gallagher.

"(k) By reason of the acts and conduct of respondent set forth in Findings of Fact 4(i) and (j) above, individuals employed by Gallagher and by other persons engaged in commerce or in an industry affecting commerce have refused in the course of their employment to process, transport or otherwise handle or work on goods, articles, material or commodities.

"(*l*) By the acts and conduct set forth in Findings of Fact 4(i), (j) and (k) above, respondent has engaged in, and has induced and encouraged individuals employed by Gallagher and by other persons engaged in commerce or in an industry affecting commerce, to engage in, strikes or refusals in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on goods, articles, materials, or commodities, or

2.  Schauffler v. Highway Truck Drivers & Helpers Local 107, 182 F.Supp. 164, 165 (E.D.Pa., Feb. 23, 1960), which contains the findings of fact, conclusions of law, opinion and order granting and later dissolving the preliminary injunction.

to perform services, and has threatened, coerced and restrained Gallagher and other persons engaged in commerce or in an industry affecting commerce.

"(m) Objects of the acts and conduct of respondent set forth in Findings of Fact 4(i), (j), (k) and (l) above, were and are (1) to force or require Gallagher to enter into a contract or agreement whereby Gallagher, at least in part, would cease or refrain or agree to cease or refrain from handling, using, selling, transporting, or otherwise dealing in the products transported or to be transported by owner-operators, or to cease doing business with owner-operators; (2) to force or require Gallagher, at least in part, to cease using, selling, handling, transporting, or otherwise dealing in the products of and to cease doing business with owner-operators; and (3) to force or require other persons to cease doing business with Gallagher.

"(n) The acts and conduct of respondent set forth in Findings of Fact 4(i), (j), (k), (l) and (m) above, occurring in connection with the operations of Gallagher, have a close, intimate, and substantial relation to trade, traffic, and commerce among the several States and tend to lead to and do lead to labor disputes burdening and obstructing commerce and the free flow of commerce."

From these and the remainder of its findings, the court reached conclusions of law which include the following (182 F. Supp. at 167–168):

"[2] (c) Respondent has engaged in unfair labor practices within the meaning of Section 8(b) (4) (i) (ii) (A) and (B) of the Act, affecting commerce within the meaning of Section 2(6) and (7) of the Act, and a continuation of said unfair labor practices will impair the policies of the Act as set forth in Section 1(b), 29 U.S.C.A. § 141(b) thereof.

"3. To preserve the issues for the orderly determination as provided in the Act, it is appropriate, just and proper that, pending the final disposition of the matters herein involved pending before the Board, respondent, its officers, representatives, agents, servants, employees, attorneys, and all members and persons acting in concert or participation with it or them, be enjoined and restrained from the commission, continuation, or repetition, of the acts and conduct set forth in Findings of Fact 4(i), (j), (k), (l) and (m) above, acts and conduct in furtherance or support thereof, or like or related acts or conduct the commission of which in the future is likely or may fairly be anticipated from respondent's acts and conduct in the past."

So a preliminary injunction was issued. Immediately thereafter the Union made a written offer to enter into an agreement with Gallagher providing in substance that the master agreement was not to be interpreted as authorizing or empowering the Union to demand that its dealings with owner-operators be discontinued or curtailed. Gallagher immediately agreed in writing to accept the offer. Thereupon, the District Court in Pennsylvania held the Union had complied with its order, and dissolved the preliminary injunction.

After the preliminary injunction had been granted and dissolved, as above outlined, the Regional Director for the Fourth Region, acting on behalf of the General Counsel, issued a complaint and notice of hearing against Local 107 of the Teamsters Union, pursuant to Gallagher's charges of early January. The complaint charged in detail that the Union had been guilty of the unfair labor practices which we have described in general, and accused the Union of violating various sections of the Act.

The Union answered, again denying it had ever intended to interfere with Gallagher's use of owner-operators. Extensive evidence was heard by a Trial Ex-

aminer whose intermediate report exonerated the Union and recommended "that the complaint be dismissed in its entirety." The Board disagreed. Its decision and order held the Union had violated Section 8(b) (4) (i) and (ii) (A) and (B) [3] and ordered it to cease and desist, and to take the usual affirmative action, including the posting of notices. A petition that we review the order was followed by the Board's cross-petition that it be enforced.

It is argued by the petitioner that the evidence in the record conclusively showed the Union had no concern with the owner-operators, and that its letter of December 21, 1959, and its subsequent strike had no connection with them. We disagree. The Union's firm refusal to give written assurance that it would not invoke contractual provisions which clearly gave it the power to curtail Gallagher's use of independent operators, together with its avowed intention to continue its attempt to ban the use of such independents, made clear the real purpose of the strike of January 4.

It would have been very simple for the Union merely to insert in its letter of December 21 a few sentences to the effect that it did not intend the contractual provisions to apply to owner-operators and would not so construe them, even though the language of the provisions included the independents. The simplicity of this solution was shown by the fact that Gallagher immediately agreed to the contract when, under the compulsion of the preliminary injunction, the Union gave the written assurance which therefore it had refused to give.

Even in this proceeding, after it had obtained the contract by giving the written assurance, the Union contends its conduct theretofore in refusing to agree in writing that owner-operators would not be affected, and in striking because Gallagher would not agree without that assurance, should not be held to be an unfair labor practice. It argues that its offer to prove that it had not interpreted similar provisions in other contracts as including owner-operators should have been sufficient. It is clear, we think, that the Board correctly found the strike was an effort to force Gallagher to agree without the written assurance which was finally given.

We regard the findings, conclusions and opinion of the District Court in the Eastern District of Pennsylvania as quite persuasive on the merits of the controversy. But its decision was by no means a disposition of the case on the merits and did not moot the Board proceedings. That court's preliminary injunction expressly provided that it should be effective "pending the final disposition of the matters involved pending before the National Labor Relations Board."

Other arguments advanced by the Union do not seem to us to require discussion. The record as a whole amply supports the Board's order, so the Board's petition for enforcement will be granted.

It is so ordered.

3. These sections provide as follows:
"8(b) It shall be an unfair labor practice for a labor organization or its agents—
    *      *      *      *      *
"(4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or
"(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
"(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;
"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *."