Gerald A. BROWN, Regional Director of the Twentieth Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

AMERICAN FEDERATION OF TELEVISION & RADIO ARTISTS, SAN FRANCISCO LOCAL, and National Association of Broadcast Employees & Technicians, Sacramento Local 55, Respondents.

Civ. No. 8225.

United States District Court
N. D. California, N. D.
Feb. 23, 1961.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Winthrop A. Johns, Asst. Gen. Counsel, Washington, D. C., Louis S. Penfield, Regional Atty., Region 20, Philip P. Bowe and Walter N. Moldawer, Attys., N. L. R. B., San Francisco, Cal., for petitioner.

Pillsbury, Madison & Sutro, Charles F. Prael and William I. Edlund, San Francisco, Cal., for Great Western Broadcasting Corp.

Neyhart & Grodin and Stanley H. Neyhart, San Francisco, Cal., for respondents.

HALBERT, District Judge.

Respondent labor organizations are charged with engaging in an unfair labor practice, namely: organizing and participating in an illegal secondary boycott in violation of Title 29 U.S.C.A. § 158(b) (4) (ii) (B). Petitioner's preliminary investigation has led him to conclude that a complaint should be issued against respondents by the National Labor Relations Board. Accordingly, he has, pursuant to Title 29, U.S.C.A. § 160 (*l*), petitioned this Court for a temporary injunction against further violation of the law by respondents.

### The Facts of the Case.

Respondents are labor organizations as defined in Title 29 U.S.C.A. § 152(5). Respondents are currently engaged in a strike against Great Western Broadcasting Corporation, which operates Television Station KXTV—Channel 10 (Great Western Broadcasting Corporation has intervened in this suit. Hereafter in this memorandum this corporation will be referred to as KXTV). KXTV is en-gaged in commerce within the meaning of Title 29 U.S.C.A. § 158(b) (4) (See Footnote 1).

Respondents sought to induce customers of KXTV to engage in a boycott of the station. It is not disputed that respondents may legally appeal to the sympathy of advertisers on KXTV in order to persuade them, voluntarily, to boycott the station. Such action would be a primary consumer boycott, as the strike itself is a primary employee boycott.

Respondents, however, did not limit themselves to an appeal to the sympathy of the advertisers on KXTV. They used various means to exert coercive pressure on those advertisers, in order to compel them to boycott KXTV. Respondents are clearly shown (For the most part, the facts are stipulated.) to have done the following things:

They approached various advertisers and asked them to cease doing business with KXTV. When these advertisers refused, respondents threatened to publicize the fact that the said advertisers were patronizing the allegedly unfair station. Among these advertisers were Benicia Development Co. doing business as John Geer Chevrolet Co., Capitol Studebaker Co., Rainbo Baking Co., Shell Oil Co., and Burgermeister Brewing Co. (Hereafter in this memorandum the advertisers just listed will be referred to, respectively, as Geer, Capitol, Rainbo, Shell and Burgermeister.). Each of the listed advertisers is engaged in commerce or in an industry affecting commerce, within the meaning of such terms as they are employed in Title 29 U.S.C.A. § 158(b) (4).[1]

Capitol cancelled its contract with KXTV by a letter (petitioner's exhibit 4) which stated that the cause of the cancellation was a telephone campaign organized, according to the telephoners, by union supporters. Those who called Capitol were stated to have threatened to

---

1. The facts as to the nature and character of KXTV's, Geer's, Capitol's, Rainbo's, Shell's and Burgermeister's business which involve or affect commerce are admitted. Those facts are in substantial fashion well known in the community, so the Court can, without impropriety, take judicial notice of them. Under such circumstances, no formal proof of such facts was required.

boycott Capitol as long as it continued to advertise on KXTV.

The remaining advertisers continued to advertise on KXTV. Respondents then had printed a leaflet (petitioner's exhibit 2) [2] and distributed it in union halls and meetings, at a market which sells the products of Rainbo and Burgermeister, and in various other places in the Sacramento area.

When these leaflets were found distributed in places where Rainbo sold its product, Rainbo capitulated, and cancelled its contract with KXTV.

Respondents prepared and printed in quantity leaflets (petitioner's exhibits 5–15) describing certain firms (including Geer, Handy Andy TV, Lucky Markets, and others) as continuing to advertise with KXTV despite the strike. These leaflets asked the customers of these firms not to patronize them. It is not shown that Handy Andy TV, Lucky Markets, or the others of these firms, except Geer, are engaged in commerce or industry affecting commerce. A leaflet from this group, pertaining to Handy Andy TV, was exhibited to the proprietor of that concern, with the threat that it would be distributed if the firm continued to advertise on KXTV. Respondents telephoned a representative of Geer, and told him that the respondents had printed up leaflets of the nature of petitioner's exhibit 5, which would be distributed in front of Geer's place of business and elsewhere, unless Geer ceased to do business with KXTV. Geer did not capitulate, and the leaflet has not as yet been so distributed.

Respondents addressed letters to advertising agencies and sponsors, approximately 18 or 20 in number, in which letters it was indicated that those firms who advertised on KXTV during the period of the strike would be considered as taking sides in the strike, and that union members, and those sympathetic to or-ganized labor, would cherish a long-lasting resentment against any such firm (Representative samples of these letters are petitioner's exhibits 16 and 17).

Respondents requested the San Francisco Labor Council and the members of affiliated unions to return their Shell credit cards. They also asked union members not to use products and services of Geer and other firms. A number of individuals mailed in their credit cards to Shell, with a request that they be returned if the strike were settled or Shell's contract with KXTV cancelled (See petitioner's exhibits 18, 19 and 20).

Certain advertisers discontinued doing business with KXTV for undisclosed reasons connected with the strike (See respondent's exhibits A, B, C and D for identification). As it is not established that the reason for such cancellation was force or coercion, these exhibits are irrelevant, and have not been considered. It is apparent that most of these advertisers were political candidates who hoped to gain labor votes by boycotting KXTV.

### The Law Pertaining to Secondary Boycotts.

■ It is an unfair labor practice for a labor organization to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where an object of such action is forcing or requiring any person to cease doing business with any other person, except where such activity is in the course of a primary strike or primary picketing (Title 29 U.S.C.A. § 158(b) (4) (ii) (B)). Publicity, other than picketing, for the purpose of truthfully advising the public that products are produced by an employer with whom a labor organization has a primary dispute and distributed by another is lawful as long as it does not result in a secondary strike (Title 29 U.S.C.A. § 158(b) (4)).

---

2. These leaflets state that KXTV is unfair, in bold type, and that Geer, Rainbo, Shell, and Burgermeister are still advertising on the Station. In smaller print, it is stated that the leaflet is directed to the customers of the advertisers, and is not a request to their employees to refuse to pick up, deliver, transport or perform any service.

Respondents contend that their activities which are the subject of this action are protected by the free speech guarantees of the First Amendment to the Federal Constitution. They further contend that one may threaten to do anything which he may lawfully do, citing the California Supreme Court decision in McKay v. Retail Automobile Salesmen Union, 16 Cal.2d 311, 106 P.2d 373.

■ All of the parties have made considerable reference to the legislative history of the law here construed. Although complex, the statute involved in this case is clear in its purport. Legislative history is to be used to resolve ambiguities in statutes, not to create them or to vary the terms of the statute (United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 53 S.Ct. 42, 77 L.Ed. 175; United States v. Mock, D.C., 143 F.Supp. 661; and See: Commissioner of Internal Revenue v. Acker, 361 U.S. 87, 80 S.Ct. 144, 4 L.Ed.2d 127). It is not necessary to turn to legislative history to resolve this case. A cursory examination of the legislative history of the statute here involved fails to disclose any legislative intent contrary to the legislative command clearly and unequivocally set forth in the statute.

■ An appeal for a secondary boycott is not protected free speech, under the First Amendment to the Federal Constitution, and Congress may lawfully forbid expression of speech urging such illicit action (International Brotherhood of Electrical Workers v. National Labor Relations Board, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299).

The leaflet, petitioner's exhibit 2, which did not in explicit terms urge unlawful action, might come close to the protection of the First Amendment. It would appear to be designed to leave the impression that it is nothing more than a mere reporting of the facts. However, it is very patent that the obvious goal of the draftsman was to cling to the skirts of the protections of the Constitution while violating the spirit, at least, of the statute under consideration. The state-

ment at the bottom of the leaflet that it is directed to the customers of the advertisers, and is not a call for a strike, could lead an unbiased intelligent reader to but one conclusion, and that is that there *is* a call for a consumer boycott of the advertisers, with whom respondents had no primary dispute. It is unrealistic to urge this Court to blind itself to the real purpose of the leaflet. Moreover, most passers-by, when handed such a leaflet, would be unlikely to read more than the word "unfair," which by common usage has in the mind of the general public become unseverable from the mandate "boycott this firm."

■ In all events, even if respondents *were* entitled to publicize the facts by circulating such a leaflet, they were *not* entitled to threaten KXTV's advertisers, engaged in commerce, with such action, in order to force or require them to cease doing business with KXTV. It is *not* true that one may threaten to do whatever he may do. One may not threaten to take lawful action, where the purpose of the threat is illicit. Thus, a magazine editor may lawfully publish the truthful facts concerning unsavory incidents in the life of a person who is prominent in the public eye, such as a movie star or politician; but the magazine editor may not lawfully threaten to publish such facts unless the person concerned pays blackmail to the editor.

The threat to circularize petitioner's exhibit 2, made to persons in commerce in order to force or require them to cease doing business with KXTV, was a clear violation of Title 29 U.S.C.A. § 158 (b) (4) (ii) (B).

Respondents argue that their conduct is protected by the proviso allowing publicity other than picketing for the purpose of truthfully advising the public that products produced by an employer with whom there is a primary dispute are distributed by another employer. The purpose of this proviso is clear. Many employers sell their products at wholesale. Retailers are generally employers themselves, and likely to be sympathetic to the labor problems of other employers.

An appeal to the sympathy of retailers would be of little avail to the union forces seeking to impose a consumer boycott. So the law allows a limited kind of secondary boycott, which boycotts the products made by the employer against whom the primary strike is going on, even though those products are sold by a neutral retailer. Only thus can any appeal to the general consuming public be made.

If respondents had had a primary dispute with Shell, or Rainbo, or Burgermeister, then respondents' conduct in trying to get consumers to boycott such products in retail outlets would have been protected by the cited proviso. Such conduct would have been aimed at producing a lawful kind of secondary boycott. But respondents had no primary dispute with such employers. Any boycott of their products was an unlawful secondary boycott. In this case, we have three examples of a tertiary boycott of the products of a neutral advertiser, when offered for sale by a neutral retailer. Such conduct is clearly outside the pale of the law.

Distribution of any of the leaflets (petitioner's exhibits 5–15) calling for a boycott of neutral employers would be unlawful where those employers were engaged in commerce. Such activity would be coercion of those employers to force them to cease doing business with KXTV. The threat to distribute those leaflets, made to Geer, was clearly an unlawful threat under § 158(b) (4) (ii) (B). Whether the threat to Handy Andy TV was lawful or unlawful would depend on whether that firm was engaged in commerce or in an industry affecting commerce.

The threats embodied in the letters to advertising firms (petitioner's exhibits 16 and 17) were unlawful to the extent that they were aimed at firms engaged in commerce or in an industry affecting commerce.

The boycott of Shell was clearly an unlawful coercive activity. The letters written by union sympathizers (petitioner's exhibit 20) clearly show that they were designed to force or require Shell to boycott KXTV. Petitioner's exhibits 18 and 19 show the coercive activity of respondents designed to force Shell to cease doing business with KXTV. It is patent that this activity led to the letters which make up exhibit 20. Such activity was clearly in violation of the explicit commands of the laws of the United States.

No individual is required to trade with Shell or any particular company, by any law of our land. On the other hand, the law does forbid individuals to boycott Shell, as part of a labor organization's drive to coerce that company into cancelling its contract with KXTV.

Concerted activity for an unlawful purpose is unlawful, and this can be true even though the acts of each individual, taken separately, may well be within his legal rights. For example, any electrical company may bid or not bid, as it chooses, on government contracts, and if it chooses to bid, it may set the amount of its bid at any figure that it wishes. Nothwithstanding these rights, it is nonetheless unlawful for the officials of the companies to confer, and to exchange information on their proposed bids, for the purpose of destroying the competitive nature of the trade. It is unlawful for them to agree on which company is to get the bid, and at what amount. Such exchanges of information, and such agreements, are not protected free speech. Recently, a number of electrical company officials have violated this law against concerted action for unlawful economic purposes, and as a result a number of them went to jail. Respondents and their officials are the beneficiaries of a more lenient policy of the law. Although they, too, are in clear violation of the law just as the electrical company officials were, the only recourse against them is an injunction—a solemn legal warning against further violation of the law. Such an injunction is clearly in order in this case, and, accordingly, the relief sought by petitioner at this time will be granted.

It Is, Therefore, Ordered that petitioner's petition for a temporary injunction

restraining respondents, their employees and agents, and those acting in concert with them, from further unlawful activity against the advertising customers of KXTV be, and the same is, hereby granted;

And It Is Further Ordered that petitioner prepare all documents necessary for the complete disposition of this case in accordance with this memorandum and order, and lodge them with the Clerk of this Court, pursuant to the applicable rules and statutes.