**GREAT WESTERN BROADCASTING CORPORATION, d/b/a KXTV,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

American Federation of Television and Radio Artists, San Francisco Local, and National Association of Broadcast Employees and Technicians, Local 55, Intervenors.

No. 17698.

United States Court of Appeals
Ninth Circuit.

Nov. 9, 1962.

Pillsbury, Madison & Sutro, and Charles F. Prael, Noble K. Gregory, William I. Edlund, and James F. Kirkham, San Francisco, Cal., for petitioner.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Herman M. Levy, and Norton J. Come, Attorneys, National Labor Relations Board, Washington, D. C., for respondent.

Neyhart & Grodin, Duane B. Beeson, San Francisco, Cal., and Mortimer Becker, New York City, for intervenors American Federation of Television and Radio Artists, etc.

Douglas A. Anello, Robert V. Cahill, and David L. Doughty, Washington, D. C., Amicus Curiae, in support of petitioner, National Association of Broadcasters.

Before BARNES, HAMLEY and JERTBERG, Circuit Judges.

HAMLEY, Circuit Judge.

This is a proceeding to review an order of the National Labor Relations Board dismissing an unfair labor practice complaint. The case involves an attempt by two unions, assertedly using coercive methods, to force several companies to cease advertising on a television station with which the unions were having a labor dispute. It was charged that the union activity was proscribed by section 8(b) (4) (ii) (B) of the National Labor Relations Act, as amended (Act), 29 U.S.C. § 158(b) (4) (ii) (B).

The charging party, and petitioner here, is Great Western Broadcasting Corporation, which operates television station KXTV in Sacramento, California. The unions, which were respondents in the Board proceedings and are intervenors here, are American Federation of Television and Radio Artists, San Francisco Local, and National Association of Broadcast Employees and Technicians, Local 55.

The facts are not in dispute. A primary labor dispute between the unions and KXTV resulted in a strike which commenced on September 26, 1960. Picketing of the KXTV premises ensued. Among the advertisers who then regularly used the services and facilities of KXTV for advertising purposes were John Geer Chevrolet Company (Geer), Capitol Studebaker Company (Capitol), Rainbo Baking Company (Rainbo), Shell Oil Company (Shell), Burgermeister Brewing Corporation (Burgermeister), and Handy-Andy. Each of these advertisers is an employer engaged in commerce or in an industry affecting commerce within the meaning of the Act.

In an effort to win their labor dispute with KXTV, the unions took the following action:

(1) had committees of the unions call upon all of the advertisers who used KXTV for the purpose of requesting them to discontinue their patronage of the station and assist the unions in their cause against KXTV;

(2) had a committee call upon Capitol for the same purpose, in the course of which this advertiser was told that if it continued to advertise on KXTV the Labor Council would undoubtedly print the name of Capitol in the Labor Bulletin as not supporting the strike;

(3) mailed to all KXTV advertisers a letter setting forth the

background of the strike and requesting discontinuance of advertising over the station, warning that failure to do so would bring an adverse economic reaction;[1]

(4) printed and distributed four thousand handbills listing KXTV as "unfair", and naming Geer, Rainbo, Shell and Burgermeister as advertisers who nevertheless continued to utilize the services of the station, such distribution being made in front of KXTV, at the Sacramento Labor Temple, and at various Sacramento grocery stores which handled Rainbo bread and Burgermeister beer;[2]

(5) sent a letter to the San Francisco Labor Council asking the Council to return its Shell credit card to that company and to request the members of affiliated unions to do likewise;

(6) sent a later letter to the San Francisco Labor Council listing fourteen companies who were then advertising on station KXTV," with the observation that "any aid" the Council and its affiliated members "can give in this sponsor area" would be appreciated;

(7) showed to the President of Handy-Andy, with an appeal to stop advertising on KXTV, a copy of a newly-printed leaflet which gave the background of the labor dispute with KXTV, named Handy-Andy as a company which continued to do business with KXTV, and added the comment: "We think you will agree that this continued association is contrary to the best interests of working people, and the public";[3]

(8) telephoned the general manager of Geer and, in conjunction with an appeal to have Geer cease advertising on KXTV, informed him that a new leaflet was being printed naming Geer as a sponsor still advertising on KXTV and that if Geer continued to do business with the station, this leaflet would be passed out in front of Geer's establishment, among other places.

As a result of the described union activity one KXTV advertiser was subjected to a secondary boycott and at least two other advertisers ceased doing business with that station.[4]

1. This letter contained these statements:
"* * * Any advertiser on this station while it is being operated by strike breakers will give the impression of taking sides in this dispute * * *.

"* * * We are about to launch an intensive campaign to bring the facts behind this dispute to the attention of the entire population covered by this station. We are sure you recognize the obvious fact that many members of organized labor and their families, and those sympathetic to the cause of organized labor, will have long-lasting resentment against any product or sponsor who takes sides in this dispute by advertising on this station during the course of this worthy strike.

"If you are currently advertising for clients on this station, or have any advertising projected for the next six months, we are sure you will wish to change your plans to avoid the inevitable adverse reaction * * *."

2. Copies of this leaflet were also found stuffed between loaves of bread at a supermarket supplied by Rainbo. The leaflet carried this note:
"This statement is directed to the customers of the above advertisers. It is not a request to employees to refuse to pick up, deliver or transport, or to refuse to perform any service."

3. One thousand of these leaflets were printed, and a like number of ten similar leaflets were printed, each naming a different company which continued to advertise on KXTV. None of these leaflets, however, were distributed.

4. As a result of the first letter sent by the unions to the San Francisco Labor Council, Shell received numerous letters enclosing Shell credit cards. The individual writers explained that they would pick up their cards in the future when Shell discontinued its advertising over KXTV.
On October 10, 1960 Capitol cancelled its $8,500 advertising contract with KXTV for the duration of the strike. In a letter of explanation, Capitol told KXTV that after its televised commercial one evening, the company's phones were

There was no picketing, or threat to picket, the place of business of any of the advertisers. There was no physical violence or threat of physical violence. The handbills were truthful and their distribution was peaceful. None of the described union activity was designed to bring about a work stoppage by employees of any advertiser, and none had that effect.

On these facts the Board, with one member dissenting, held that the described union activity was protected by the publicity proviso at the end of section 8(b) (4) of the Act.[5] The complaint was therefore dismissed in its entirety.[6]

Petitioner here challenges the Board conclusion that the publicity proviso is applicable under the facts of this case. It contends that since that proviso pertains only to publicity concerning a "product" or "products" which are "produced" by a primary employer and which are thereafter "distributed" by another employer, the service rendered by a television station is not included therein.[7]

The Board, as respondent on this review, joins issue on this point. The two unions, which were respondents in the agency proceeding and are intervenors here, support the Board's position that the publicity proviso is applicable and protects the union activity in question.

In determining which of these conflicting constructions of the proviso is correct, the critical statutory words, none of which are defined in the Act, are "product," "produced," and "distributed."

In its broadest sense, the term "product" denotes anything which is produced. Since economic activity includes the rendition of services, it is appropriate, where the context otherwise permits, to refer to a completed service as a "product."

In this case, however, as all seem to recognize, the context in which the term "product" appears in the proviso precludes the view that the television service rendered by KXTV, considered alone, is a "product" within the meaning of the proviso.[8] One reason for this con-

"jammed" from 7:00 to 9:30 P.M. by callers claiming to be union people. These callers criticized Capitol for not supporting the strike and, in substance, said that for this reason they would not do business with the company.

On November 10, 1960, and as a result of the pressure described above, Rainbo cancelled a $26,000 advertising contract which it had entered into with KXTV a month previously.

5. Section 8(b) (4) provides in pertinent part:
"(b) It shall be an unfair labor practice for a labor organization or its agents—
* * * * *
"(4) * * * (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where * * * an object thereof is—
* * * * *
"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, * * *.
* * * * *

"Provided further, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution; * * *."

6. A preliminary injunction against the unions which the Board had obtained, reported sub nom. Brown for and on Behalf of N. L. R. B. v. American Federation of Television & Radio Artists, San Francisco Local, N.D.Cal., 191 F.Supp. 676, was thereafter dismissed.

7. In support of the same proposition, the National Association of Broadcasters has filed an amicus curiae brief in this court.

8. In holding that the "privilege" which a television network sells to a sponsor

clusion is the fact that in two other places in section 8(b) (4), the term "services" is used in contradistinction to tangible articles.[9] It is likely that Congress would have followed this same format if it had intended the publicity proviso to apply with regard to a primary employer who renders services instead of manufactures tangible articles.

■ A second and still more persuasive reason why television advertising service, considered alone, could not be a "product" within the meaning of the publicity proviso lies in the fact that the only "products" there referred to are those which are capable of being "distributed" by "another employer." An advertising service rendered by a television station is not capable of being so "distributed," least of all by an employer whose only relationship with the station is that of an advertiser.

The Board, however, believes that it has overcome this difficulty by holding that it is not the television service of KXTV, standing alone, which is the "product" here, but the item being advertised on that station. KXTV becomes one of the "producers" of the items advertised, the Board reasons, "by adding its labor in the form of capital, enterprise and service * * *" to such items.

It may be noted, however, even before testing the correctness of this line of reasoning, that it leads to the rather remarkable conclusion that a television station can be a producer of automobiles, bread, gasoline and beer.[10]

In reaching its conclusion the Board followed its decision rendered on October 31, 1961, in Middle South Broadcasting Co., 133 NLRB No. 1698. The primary employer in that case was a radio broadcasting station. In turn, the decision in Middle South Broadcasting was based upon the Board's decision rendered on August 10, 1961 in International Brotherhood of Teamsters, etc. (Lohman Sales Company) 132 NLRB 901. There the primary employer was a wholesale distributor of cigarettes, cigars, other tobacco products, candy, and related products. The issue was whether a wholesale distributor is a producer of products within the meaning of the proviso.

In the Lohman case the Board first determined that, so far as human effort is concerned, labor is the prime requisite of one who produces.[11] The Board then reasoned that not only the actual manu-

---

is not a "commodity" within the meaning of sections 2(a) and 3 of the Clayton Act, 15 U.S.C., sections 13(a), 14 it has been held that the most reliable guide to the meaning of the word is the context in which it is employed. Columbia Broadcasting System v. Amana Refrigeration, Inc., 7 Cir., 295 F.2d 375, 378.

9. In section 8(b) (4) (i), the following words are used: "* * * to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities *or to perform any services;* * * *." (Emphasis supplied.) Near the end of the publicity proviso itself, the following language appears: "* * * to refuse to pick up, deliver, or transport any goods, *or not to perform any services,* * * *." (Emphasis supplied.) In section 8(b) (4) (i) (ii) (B), while the word "services" is not used, the following language indicates the same differentiation between a primary employer who produces, proc-

esses or manufactures a tangible article, and one who does not: "* * * to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, *or to cease doing business with any other person,* * * *." (Emphasis added.)

10. It also requires one to regard the advertisers of those products, who either manufacture the articles themselves or distribute articles manufactured by companies having no connection with the television station, as the "distributors" of articles "produced" by a television station.

11. In reaching this conclusion the Board relied upon dictionary definitions, primarily upon a definition of "product" to be found in A. Merriam Webster, Webster's New Collegiate Dictionary, 1959, and an explanation of the term "production" contained in Black's Law Dictionary, Fourth Edition, West Publishing Co.,

facturer, but also the wholesaler, adds "labor in the form of capital, enterprise, and service to the product he furnishes the retailers." "In this sense, therefore," the Board stated, "Lohman, as the other employers who 'handled' the raw materials of the product before him, is one of the producers of the cigarettes distributed by his customers \* \* \*."

In the Board's contemplation then, the "production" of cigarettes includes every phase of activity, beginning with the combination of tobacco seed, earth and water, and ending with the ready availability of cigarettes to the smoking public. Each employer in the process of production begins with what, to him, are raw materials, and "produces" what to him is a finished "product." The wholesale distributor (or in our case the television station) "handles" cigarettes which are not yet readily available to the members of the smoking public in the same sense as the manufacturer "handles" raw tobacco which has not yet become cigarettes. In this sense the wholesale distributor and the television station are producers of products capable of being distributed by their successors in the production process.

As we have indicated earlier in this opinion, the terms "product," "produce" and "production" may be construed this broadly if they are not found in a more restrictive context. But, as we have also indicated earlier, the context in which the words "produce" and "product" are found indicates that in using them Congress was referring to one kind of economic activity and its result rather than to all economic activity and its result.

The Board proceeds on the assumption that Congress intended "product" to encompass the results of all forms of economically productive labor. Yet it concedes that a television station's product is not advertising but the subject of the advertising. So long as the subject of the advertising is a tangible article these propositions need not lead to an incongruous result.

But if, instead of a tangible article, the subject of the television advertising is a service, such as banking or cleaning, an internal inconsistency at once appears.[12] It derives from the fact that while television advertising service, as such, is not to be regarded as a "product" under the proviso, because it is not capable of being distributed, a service being advertised on television is to be regarded as a "product," although it is equally incapable of being distributed.

Thus, while the Board adopts a broad construction of the term "product" in order to obviate the incongruity of saying that a television advertising service is capable of being distributed, we find that, after all, the underlying difficulty has not been avoided. The Board is still saying that a service, though one being advertised rather than the television service itself, is a "product," although not capable of being distributed.

Only now the Board has involved itself in the additional difficulty of saying that a television station is a "producer" of banking and cleaning services which are "distributed" by banks and cleaners. If the capacity for distribution require-

1951, pages 374–375. The latter definition is as follows:

"In political economy. The creation of objects which constitute wealth. The requisites of production are labor, capital, and the materials and motive forces afforded by nature. Of these, labor and the raw materials of the globe are primary and indispensable. Natural motive powers may be called in to the assistance of labor and are a help, but not an essential, of production. The remaining requisite, capital, is itself the product

of labor. Its instrumentality in production is therefore, in reality, that of labor in an indirect shape. Mill, Political Economy; Wharton."

12. There is evidence in the case before us that the unions directed informational activity against one bank and one dry cleaning establishment. Since neither the bank nor the cleaners was found to be engaged in commerce or an industry affecting commerce, however, the union's activity with respect to them is not in issue here.

ment is to be ignored it might as well be at the outset, with reference to television advertising service, thereby avoiding the futile involvements inherent in the Board's broad construction.

The Board expressed the view in Lohman that unless its concept were accepted, it must follow that "vast numbers of our working population produce nothing."[13] The weakness of this argument lies in the assumption that if, for the purposes of the proviso, the term "product" must be limited to a tangible article, it must follow that even in a broad economic sense, only those engaged in manufacturing tangible articles are "producers."

The two frames of reference should not be confused. For the limited purposes of the proviso only those who deal with tangible articles are "producers," but in general economic theory, all who engage in useful labor, whether or not directly related to tangible articles, are "producers." In order to hold that a television station is not, within the meaning of the proviso, the producer of automobiles which it advertises, it is not necessary to conclude that the engineers, announcers, advertising men and others employed by the station are not "productive." They perform a television advertising service, just as the employees of Lohman perform a distribution service. But since the fruit of their labor is not capable of physical distribution by others, it is not a "product" as that term is used in the proviso.

The Board believes that the legislative history indicates that the result reached in Lohman, Middle South Broadcasting and this case, is what Congress really intended.

We very much doubt that the statutory language of the publicity proviso is ambiguous with regard to the meaning of "produced," thereby warranting reference to legislative history. While this term is not defined in the Act, the context indicates to us that, in the proviso, Congress was referring to the activity of a primary employer in applying capital, labor and enterprise to effect the conversion of raw materials in his possession into a more finished tangible article.

In section 8(b) (4) (i) (ii) (B), which contains the only statutory reference to the kind of employers who can be the creators of "products," as that term is used in the Act, the words used are: " * * * the products of any other producer, processor or manufacturer * * *."[14] The words "processor" and "manufacturer" refer to persons engaged in a physical creative activity, and it is reasonable to believe that the word "producer" was used in the same sense. There is no reason to believe that "produced" was used in the proviso in any different sense than "producer" was used in section 8(b) (4) (i) (ii) (B).

But, assuming that resort to legislative history is appropriate, we believe it to be inconclusive as to the point under discussion.

It is true that this history indicates that some Senators and Congressmen expressed the view that inclusion of the publicity proviso was necessary because without it, section 8(b) (4) (ii) (B) might outlaw forms of publicity such as leaflets, radio broadcasts, and newspaper advertisements, thereby impinging upon free speech.[15] The Board argues, in effect, that there is no reason to believe

---

13. Developing this idea, the Board said in Lohman:

"* * * Their thought, labor, or business enterprise is not a 'product.' We do not believe that the plain meaning of the words 'product' and 'produced' requires the Board to draw an uncertain line between those employers engaged essentially or only incidentally in the fabrication of products; between those employers who create a new product or embellish an old one; between products of the imagination and those that can be seen, touched, or smelled."

14. The pertinent part of section 8(b) (4) is quoted in note 5.

15. When the proposed 1959 amendment of section 8(b) (4) got to conference without such a proviso, Senator Kennedy and Representative Thompson expressed this concern. (105 Cong.Rec. 16591; II Leg-

that Congress was less interested in preserving free speech where the primary employer is a distributor, or a radio or television operator, than when he is a manufacturer of tangible articles.

If all that Congress really had in mind in adding the publicity proviso was to implement, with respect to leaflets, broadcasting and newspapers, the free speech guarantee of the First Amendment, the proviso was not needed and would have to be regarded as surplusage. Section 8 (c) of the Act, 29 U.S.C. § 158(c), already in effect, provided complete implementation of the First Amendment in this regard.[16] As intervenors in this case concede, section 8(c) is "no more than a restatement of the principle embodied in the First Amendment," quoting N. L. R. B. v. LaSalle Steel Co., 7 Cir., 178 F.2d 829, 835.

Section 8(c), however, does not protect, under the guise of free speech, publicity activity which is associated with coercion, since that subsection ends with the words, " *   *   * if such expression contains no threat of reprisal or force or promise of benefit." Thus if Congress desired to protect any kind of publicity which was associated with coercion, it was necessary to add statutory language which did not contain the limitations built into section 8(c). Apparently Congress did want to protect some publicity of this kind, and so solved the problem by adding the publicity proviso.[17]

This demonstrates, we think, that the meaning of "produced," as used in the publicity proviso, is not to be given an all-inclusive construction on the theory that Congress was trying to guarantee free speech. On the contrary, it suggests that since the publicity being protected by the proviso could be of a kind associated with threats, coercion, or restraint, Congress did not intend an expansive exception but chose words which would have limited application.

Had Congress intended to except publicity concerning primary employers whose own products were of an intangible nature not capable of "distribution," the

islative History of the Labor-Management Reporting and Disclosure Act of 1959 [Leg.Hist.] 1708). The proviso was thereafter added as a "clarification." (105 Cong.Rec. 18022; II Leg.Hist. 1712). In discussing the addition of this proviso, Senator Kennedy explained that, without the proviso, the amendment of section 8(b) (4) would have prohibited "the handing out of handbills or even taking out an advertisement in a newspaper." (105 Cong.Rec. 17720, 17898–17899; II Leg.Hist. 1388–1389, 1432). Senator Douglas and Representative Udall similarly expressed the view that the proviso was necessary to protect free speech. (105 Cong.Rec. 19904, 18135; II Leg.Hist. 1834, 1722).

16. Section 8(c) reads:
"(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

17. The Board has itself held, in Lohman, Middle South Broadcasting Co. and the case now before us, that the publicity proviso excepts certain publicity although coercion may be involved. The statutory authority for this is to be found in section 8(b) (4) (ii), quoted in note 5.
The Board said in Lohman, at page 904:
" *   *   * While such conduct otherwise might constitute restraint and coercion, we agree with the conclusion of the Trial Examiner that Respondent's handbilling in this case was protected by the proviso to Section 8(b) (4)."
The Board reached a similar conclusion in its Middle South Broadcasting Co. decision, saying, at page 1705:
" *   *   * We also agree with his [Trial Examiner's] finding that, unless protected by the proviso to Section 8(b) (4), Respondent's circulation and distribution of the 'Do Not Patronize' leaflets urging a consumer boycott of secondary employers still advertising on WOGA, would constitute 'restraint or coercion' within the meaning*of Section 8(b) (4) (ii) (B) and a violation of that section."
In the case now before us the Board, in its decision, makes reference, with approval, to its holding in Lohman that publicity activity may be protected by the publicity proviso, although such activity "might constitute restraint and coercion *   *   *."

proviso could have been much simpler than that which was enacted. It would have been sufficient to say that nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, "for the purpose of truthfully advising the public (including consumers) that *an establishment is operated,* or goods are produced or distributed, by an employer engaged in a labor dispute \* \* \*." (Emphasis supplied.)

In fact these identical words were proposed in a Senate Resolution, instructing the Senate conferees on S. 1555, offered in the Senate on August 28, 1959, by Senators Kennedy, McNamara, Morse and Randolph.[18] This resolution was not adopted.

Unlike the language proposed in the resolution which was not adopted, the statutory proviso does not include, among designated primary employers, those who "operated" establishments or "distributed" goods. The only primary employers referred to in the enacted proviso are those who produce a product or products. This class of employers is further defined and restricted by the additional provision that the employer must be one who produces products capable of distribution.

It seems unlikely that an easy way of expanding the coverage of the proviso would have been rejected and detailed limiting provisions (which under the Board's reasoning become surplusage) would have been developed, if it had been intended that the proviso was to have the broad coverage given to it by the agency.[19]

The foregoing considerations lead us to conclude that the publicity proviso which is a part of section 8(b) (4) (B) does not protect publicity to the effect that television service is rendered by a station with whom the labor organization has a primary dispute, which service is being utilized by other employers.

Intervenors argue, however, that even if the publicity proviso is inapplicable there are two other reasons why the Board order should be sustained. These are: (1) Section 8(b) (4) (ii) (B) relates only to union activity which tends to "threaten, coerce, or restrain," and the activity here in question was not of that kind; and (2) the union activity involved in this case is protected by the free speech and free press provisions of the First Amendment to the Federal Constitution.

The Board relied on neither of these grounds in entering its order here under review. With regard to the "coercion" argument, a determination is complicated by the fact that eight separate and distinct union actions are drawn into question. Some may be coercive and some may not.

In our view, the Board should make a determination as to the merits of these two additional arguments advanced by intervenors before this court is called upon to consider them.

The Board order under review is reversed and the cause is remanded to that agency for consideration, on the present record, with such augmentation thereof, if any, as it may deem appropriate, of the additional questions raised by intervenors, as noted above.

18. II Leg.Hist. 1383.

19. We do not, however, agree with petitioner that significance is to be attached to the fact that, during the Congressional debates, the proviso as it was finally enacted was referred to only as one which would permit publicity concerning "goods" or "products." A close reading of the legislative history leads us to believe that reference to "goods" and "products" produced by non-union or struck "manufacturers" served only as an exemplification of the typical secondary boycott situation rather than as a conscious expression of Congressional purpose.