**LOS ANGELES MAILERS UNION NO. 9, INTERNATIONAL TYPOGRAPHI- CAL UNION, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 16887.

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 27, 1962.

Decided Oct. 25, 1962.

Rehearing Denied Dec. 6, 1962.

Mr. George Kaufmann, Washington, D. C., with whom Messrs. Gerhard P. Van Arkel, Washington, D. C., and Stephen Reinhardt, Los Angeles, Cal., were on the brief, for petitioner.

Mr. Hans J. Lehmann, Attorney, National Labor Relations Board, with whom Messrs. Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, and Marcel Mallet-Prevost, Asst. General Counsel, National Labor Relations Board, were on the brief, for respondent.

Before BAZELON, Chief Judge, and FAHY and BURGER, Circuit Judges.

FAHY, Circuit Judge.

Petitioner, the Union, seeks to have set aside, and respondent, the Board, seeks enforcement of, a Board order. The Board found that the Union threatened, coerced and restrained Hillbro Newspaper Printing Company, an em-

ployer, with an object of forcing or requiring it "to enter into" an agreement declared to be unlawful by section 8(e) of the National Labor Relations Act as amended,[1] thereby committing an unfair labor practice defined in section 8(b) (4) (ii) (A).[2] Stated otherwise, the Board found that the Union had threatened, coerced and restrained Hillbro with an object of requiring it to enter into a "hot cargo" contract.

The facts are essentially as follows: Hillbro publishes the Los Angeles Examiner, a newspaper which in its Sunday Edition was to have contained a weekly television booklet at the times here pertinent. The Union was the representative of Hillbro's mail room employees. Prior to the enactment of section 8(e) Hillbro and the Union had entered into a collective bargaining agreement which had not expired when the present difficulties arose. Section 8 of the agreement reads as follows:

"The Employer shall not require employees covered by this agreement, and the union reserves the employees' right, to refuse to process material received from, or destined for, job shops or newspaper mailing rooms (other than the mailing room of the Employers signatory to this contract), in which an authorized strike by, or a lockout of, a subordinate union of the International Typographical Union is in progress. The union will give the Employer forty-eight (48) hours' notice that a strike or lockout is in progress before the processing of

1. This section provides:
   "It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and

void * * *." 73 Stat. 542 (1959), 29 U.S.C.A. § 158(e) (Supp.1961).

2. This section provides in pertinent part,
   "It shall be an unfair labor practice for a labor organization * * * (ii) to threaten, coerce, or restrain any person * * * where * * * an object thereof is: (A) forcing or requiring any employer * * * to enter into any agreement which is prohibited by subsection [8] (e) of this section." 73 Stat. 542 (1959), 29 U.S.C.A. § 158(b) (Supp. 1961).

materials may be stopped in accordance with the foregoing provisions."

The Union also represented the mail room employees of Pacific Neo Gravure, Division of the Cuneo Press, Inc., called Pacific. Hillbro had engaged Pacific to print and handle the television booklets for use in the Examiner. The president of the Union advised the business manager of the Examiner that the Union was in a labor dispute with Pacific over the question whether Pacific should assign certain work to members of the Union or to members of another union. The Union president told the Examiner's president that the newspaper could be "headed for trouble" in the distribution of the TV booklet because of this dispute at Pacific, and that if Pacific persisted in assigning the work to members of another union the Union would consider itself locked out by Pacific and section 8 of the Union's contract with Hillbro, set forth above, would become operative, in which case the employees of Hillbro who were members of the Union could refuse to handle the television booklet for Hillbro. Hillbro took the position that section 8 of its agreement with the Union was unlawful by reason of section 8(e) of the Act, and that if the Union took action under section 8 of the agreement it would be violating section 8(b) (4). Thereafter the Union gave notice to Hillbro under section 8 of the agreement that a strike or lockout was in progress at Pacific. In a subsequent conversation with Hillbro's representative the Union president indicated that the Union had been advised by its attorney that section 8 of the agreement was lawful.[3]

We think, with the Board, that the facts as above set forth, which are based on the record, support the Board's finding of threats, coercion and restraint used by the Union against Hillbro. The Union contends, however, that such conduct could not have had as an object to force or require Hillbro "to enter into" section 8 of the agreement, because the agreement had previously been entered into and, therefore, the conduct was not within the condemnation of section 8(b) (4) (ii) (A) of the Act.[4]

■■ The position of the Board is that since the Union sought to make the employer live up to the "hot cargo" provision, that is, to treat it as being in effect, this in substance was to seek to have it entered into even though in a literal sense the parties by executing it had previously entered into it. We are constrained to agree with the Board. The thrust of Congress' effort in this area of the secondary boycott has been to do away entirely with contracts which come within section 8(e), whether executed before or subsequent to November 13, 1959, when sections 8(b) (4) (ii) (A) and 8(e) became effective. Any such contractual provision is declared to be unenforcible and void notwithstanding it was in existence when section 8(e) was enacted. To seek to give it life is in substance to seek to have it agreed to, which is no different in substance from seeking to have it entered into. As the Court of Appeals for the Fifth Circuit has recently stated,

"It cannot now be doubted that Congress has banned agreements whereby an employer refrains or agrees, expressly or impliedly, to refrain from handling the work of another

---

3. These facts have been set forth largely in the form of their recitation in the decision of the Board, and are not in significant dispute.

4. The Board does not rely upon section 8(b) (4) (ii) (B) which deals with "forcing * * * any person to cease * * * doing business with any other person." The Board's minority thought

the facts did disclose a possible violation of this second subparagraph (or part B), and that this militated against construing Part A to cover the case. But more than one section of the Act may be violated by the same conduct. If the facts fairly bring the case within "A" we think the Board may hold "A" violated notwithstanding "B" also may be violated, a question we need not decide.

employer, and these clauses must be so tested. * * * " 5

We may give language in a statute, if it will reasonably bear such a construction, the meaning Congress intends, though read literally it would bear a different meaning. The courts are under an obligation at times to do this in order to give legislation its proper application. Lynch v. Overholser, 369 U.S. 705, 710, 82 S.Ct. 1063, 8 L.Ed.2d 211, and cases cited. The courts have less reluctance in this regard when the interpretation they approve has been adopted by the agency charged with principal responsibility for administering the legislation, acting in the light of its special experience and expertise. Cf. Transcontinent Television Corp. v. F.C.C., 113 U.S.App.D.C. 384, 308 F.2d 339.

The following discussion of the problem, taken from the Board's decision in this case, seems to us sound:

> "We believe Congress sought by Section 8(e) to free the neutral employer from the inhibitions of any prior contractual commitment to boycott another employer. This freedom is important to the neutral employer not just at the time of signing the contract and in the 6-month period following. It is important at the time of the labor dispute in which the union seeks to apply the contract provision and to induce the neutral employer to engage in the boycott. Only by construing 8(e) as we do can it serve to maintain for the neutral employer, free from the restrictions of a prior contract, the 'freedom of choice at the time the question whether to boycott or not arises in a concrete situation,' [citing Local 1976, United Brotherhood of Carpenters and Joiners of America, AFL v. N.L.R.B., 357 U.S. 93, 105, 78 S.Ct. 1011, 2 L.Ed.2d 1186]."

The Union contends that in any event section 8 of the agreement is not unlawful under section 8(e) of the Act, that is, it is not a "hot cargo" clause. Although the Examiner and two members of the Board differ with the holding of the majority that the Union's conduct comes within the "to enter into" language of section 8(b) (4) (ii) (A), all agree that section 8 of the agreement is unlawful under section 8(e) of the Act. The Union's contention to the contrary is that "employees" are required by the agreement not to handle or deal in the "hot" products, whereas section 8(e) condemns only an agreement whereby the "employer" is required not to do so. But the employer functions through his employees in the matter with which we are concerned. When he enters into an agreement with their representative that they are not to handle the products referred to, the agreement as a practical matter must be held to contemplate that the employer is not to do so.6 The fact,

5. Employing Lithographers of Greater Miami, Fla. v. N. L. R. B., 301 F.2d 20, 30 (5th Cir., 1962).

6. The Kennedy-Thompson analysis made for Congress is particularly relevant here, illustrating some of the background labor practices giving rise to the need for remedial legislation. Under the prior law it was not an unfair labor practice for the union simply to persuade the secondary employer not to do business with the primary employer.

   "[T]he Teamsters Union began to exploit this [situation] by the device of hot cargo clauses. During negotiations with trucking firms the Teamsters would demand that any collective bargaining agreement include a clause by which the employer agreed that he would not truck nor require his employees to handle any freight which was hot or unfair because it came from an employer engaged in a labor dispute. * * * It is very hard for a trucking firm either to resist the Teamsters' demands for a hot cargo clause in collective bargaining, when the price of resistance would undoubtedly be a strike for still higher wages, or to refuse to live up to the contract once it has signed it, when the cost of noncompliance would undoubtedly be the Teamsters' insistence that the contract had been terminated by the violation, thus freeing the union to present new demands in collective bargaining. * * * [The new amendment] sought to correct this

if it be a fact, that other employees, not covered by the agreement, may be available to handle the goods does not serve to take the case out of the prohibitions of section 8(e). It would be unrealistic and inconsistent with the purpose of the Act to clothe with legality permission for the employer to agree that some of his employees are excused from their normal functions because other employees could be called upon to do their work, if it would be unlawful to agree to excuse all for the same reason some are excused. As the trial examiner, with Board approval, stated:

> "In practical effect, there is no distinction between an employer agreeing that he will not do business with another employer and on the other hand agreeing that he will not require his employees to handle outside merchandise from another employer. He is actually agreeing with the bargaining representative of his employees to stop doing business with the other employer under given circumstances."

The order of the Board is enforced.

### On Petition for Rehearing

The Union in its petition for rehearing correctly points out that our opinion states that prior to the enactment of section 8(e) Hillbro and the Union had entered into a collective bargaining agreement whereas in fact the agreement was executed in December 1959, subsequent to the coming into effect of section 8(e) on November 13, 1959. The agreement, however, was predated September 1, 1959, and was made effective as from the latter date.

As appears from our opinion it is immaterial that the agreement was executed in December. Section 8(e), as we

by outlawing hot cargo clauses and making existing clauses unenforcible." 2 Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 at 1706, 1707. And see Employing Lithographers of Greater Miami, Fla. v. N. L. R. B., supra note 5, 301 F.2d at

point out, condemns agreements within its ambit whether executed before or after its effective date. The basis for our decision is that the Union sought to have the agreement, which we think was within the ambit of section 8(e), treated as being in effect, and that the Board should be upheld in deciding that this brought the case within the "enter into" language of section 8(b) (4) (ii) (A). For this reason, and after considering in full the petition for rehearing, it is denied.

30, where it is stated: "Under the Refusal to Handle clause * * * the employer would bargain away his right to discharge or discipline an employee for refusing to handle lithographic production work made in a shop not under contract with the union."