**BAKERY WAGON DRIVERS AND
SALESMEN, LOCAL UNION
NO. 484, Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 17200.

United States Court of Appeals
District of Columbia Circuit.

Argued March 20, 1963.

Decided May 23, 1963.

Mr. Duane B. Beeson, San Francisco, Cal., of the bar of the Supreme Court of California, pro hac vice, by special leave of court, with whom Mr. Mozart G. Ratner, Washington, D. C., was on the brief, for petitioner.

Mr. Hans J. Lehmann, Atty., N. L. R. B., with whom Messrs. Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., were on the brief, for respondent.

Before DANAHER, BURGER and WRIGHT, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge.

This case involves a petition for review of an order of the National Labor Relations Board[1] finding petitioner, Local 484, guilty of violations of Sections 8(b) (4) (i) and (ii) (A) and (B),[2] and a cross-petition for enforcement by the Board. We affirm the action of the Board.

The several contentions urged by Local 484 require some exposition of the facts which, as is usual in cases under these sections, are rather complicated. Continental Baking Company and Oroweat Baking Company are engaged in the production of baked goods in the San Francisco area. Each has a collective bargaining agreement with Local 484,[3] negotiated through an association called the Bay Area Council of Bakery Operators, but signed individually. For many years this agreement has included a clause prohibiting the subcontracting of deliveries. In 1948 Continental approached the union with a proposal to subcontract deliveries to the Haul Right Transportation Company. The union orally agreed to this change, subject to certain conditions, here called a "guarantee," the terms of which constitute the heart of this dispute. Since 1948 the written no-subcontract clause was left unchanged, but the parties operated under the oral exception.

In 1952 the Sunrise Transportation Company replaced Haul Right Transportation Company. Sunrise, by its owner Aksland, immediately signed a collective bargaining contract with Local 484, which was to cover all operations except over-the-road deliveries. Sunrise had a contract with Teamster Local 439, an affiliate of Local 484, to cover the latter work.[4] Oroweat, in the meantime, had also adopted the practice of using Sunrise for deliveries, but was not required to give a guarantee.

---

1. 137 N.L.R.B. No. 98 (1962).

2. 49 Stat. 452, as amended, 29 U.S.C. § 158(b) (4) (i) and (ii) (A) and (B).

3. Local 484 is an affiliate of the International Brotherhood of Teamsters.

4. The relationship among Sunrise, Local 484, and Local 439 is not clear. Seven of Sunrise's eight employees belonged to Local 439, but apparently were paid according to the terms of the Local 484 contract which was generally more favorable to the employees.

In the years that followed, Sunrise from time to time fell into arrears in pension and welfare payments. When this happened, Local 484 would contact the General Manager at Continental, who would contact Sunrise concerning the arrearage. In early 1961, Sunrise again fell into arrears and Phillips, the Business Agent for Local 484, took the usual steps to obtain compliance. Sunrise forwarded payment with a form which included the names of Sunrise's employees. Phillips was surprised and disturbed to find that only one of the eight employees listed belonged to Local 484, the other seven belonging to Local 439. Phillips immediately demanded and was shown Sunrise's payroll records and job descriptions.

Phillips then again called Continental's General Manager and demanded that Continental compel Sunrise to comply with its Local 484 contract.[5] The General Manager refused, saying this was a matter between Local 484 and Sunrise. Phillips claimed that this fell within the scope of the "guarantee" given by Continental, but the General Manager, who was not with the company in 1948, denied knowledge of any such guarantee.[6] Phillips then replied that Continental had better start making arrangements to do its own delivering in compliance with the written no-subcontract clause of the contract. Phillips also told the General Manager at Oroweat to find a new carrier because Continental would no longer guarantee Sunrise's contract and Sunrise was using members of another union for deliveries. The Oroweat manager protested that

Oroweat had given no guarantee, but was told this made no difference.

In the weeks that followed, Phillips repeatedly demanded, without success, that Continental abide by its guarantee. On May 7, 1961, Phillips appeared at the Continental and Oroweat plants. He induced Continental's employees to refuse to put up the Sunrise orders, resulting in a total cessation of business between Continental and Sunrise, which condition continues to the present. At Oroweat, he induced the employees to refuse to put up any part of Sunrise's order on one day, and one-half the order the next day. For the next month, he induced Oroweat employees to refuse to help Sunrise drivers, causing up to 45 minutes delay every day. Since June, 1961, there has been no harassment at Oroweat.

In the period May 8–10, 1961, Continental, Oroweat, and Sunrise filed unfair labor practice charges against Local 484. The General Counsel immediately sought an injunction in the District Court for the Northern District of California pursuant to § 10($l$).[7] While evidence was being taken in this proceeding, the General Counsel issued a complaint charging Local 484 with violations of §§ 8(b) (4) (i) and (ii) (A) and (B) and § 8(e).[8] The latter charge was based on the theory that the cessation of business between Continental and Sunrise on May 7 was the result of a Local 484—Continental agreement. The injunction was denied,[9] but the matter went forward before the Board. Rather than take all the evidence again, it was stipulated by the parties that the Board could proceed upon the

5. The default which disturbed Phillips was quite obviously the union affiliation of the men making local deliveries. Sunrise was not in default on pension plan payments at this point.

6. The General Manager testified that he thought the prior practice was simply a gratuitous favor to the union.

7. 49 Stat. 453, as amended, 29 U.S.C. § 160($l$).

8. 49 Stat. 452, as amended, 29 U.S.C. § 158(e).

9. The opinion of Judge Harris in this proceeding, Hoffman v. Bakery Wagon Drivers & Salesmen, etc., No. 39957, N.D. Cal. (June 27, 1961), is not reported. It holds that Local 484 was engaged in a legitimate labor dispute with Continental. This determination is not *res judicata*. See Denver Bldg. and Const. Tr. C. v. National Labor Rel. B., 87 U.S.App.D.C. 293, 297, 186 F.2d 326, 330 (1950), reversed on other grounds, sub nom. Labor Board v. Denver Bldg. Counsel, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).

record made in the injunction proceedings.

The Board found no violation of § 8(e) because the cessation of business on May 7 was not the result of an agreement, but simply the refusal of the employees to handle Sunrise's goods. The Board found, however, that the union violated § 8(b) (4) (i) and (ii) (A) in that the "guarantee" which the union demanded would violate § 8(e), and that the union violated § 8(b) (4) (i) and (ii) (B) in that the coercion at Continental had as an objective the cessation of business between Continental and Sunrise. The Board further found that the union's conduct at Oroweat also violated § 8(b) (4) (i) and (ii) (B). Local 484 challenges the Board's findings on five grounds.

## I.

Local 484 contends that the finding of a subsection (B) violation at Oroweat must be reversed because (1) it was *de minimis*, and (2) the objective of the union's activities there was not the cessation of business.

We are not persuaded that the interference at Oroweat was *de minimis*. Moreover, the determination of what constitutes serious harassment of an employer is one which the Board is competent to make, and falls in an area where the courts should "defer to the expertise of the Board and accept its determination that the difference [is] not *de minimis* and that there [is] a resulting injury or prejudice." N. L. R. B. v. Dal-Tex Optical Company, 5 Cir., 310 F.2d 58, 62 (1962).[10]

The union's further contention that its harassment of Oroweat was not for the purpose of compelling a cessation of business is not supported by the rec-

ord. Phillips demanded that Oroweat cease doing business with Sunrise and engage a new carrier. The union does not deny this. The findings of the Board, therefore, are clearly supported by substantial evidence.

## II.

With reference to Continental, the union contends initially that the finding of a violation of subsection (A) is "beyond the scope of the complaint and [has] not been litigated." An examination of the complaint and the record shows that this contention is without merit.

Paragraph IX of the complaint charges the union with coercive conduct having the objective that the employers "agree to cease doing business with [Sunrise]." Paragraph XII charges that such acts of coercion were to force the employers "to enter into an agreement, prohibited by Section 8(e) of the Act, * * * [constituting] unfair labor practices within the meaning of Section 8(b) (4) (i) (ii), subparagraphs (A) and (B)." As shown infra in Part III, the evidence substantiated these allegations, it being proved that the union was seeking to reinstate the guarantee, and that the terms of the guarantee violated Section 8(e).

No one would dispute the general proposition that one cannot be found guilty of an offense not encompassed by the complaint.[11] But this does not mean that Labor Board complaints must conform to the technicalities of common law pleading. It is sufficient that the respondent "understood the issue and was afforded full opportunity to justify [its] action[s]." National Labor Relations Board v. Mackay Co., 304 U.S. 333, 350, 58 S.Ct. 904, 912, 82 L.Ed. 1381 (1938).[12] On the record here we find these conditions met.

10. National Labor Relations Board v. Eanet, 85 U.S.App.D.C. 371, 179 F.2d 15 (1949), relied upon by the union, is clearly distinguishable on the facts.

11. Petitioner cites N. L. R. B. v. H. E. Fletcher Co., 1 Cir., 298 F.2d 594 (1962); N. L. R. B. v. Guernsey-Muskingum Electric Co-Op., Inc., 6 Cir., 285 F.2d 8 (1960); Douds v. International

Longshoremen's Ass'n, 2 Cir., 241 F. 2d 278 (1957); National Labor Relations Board v. Kanmak Mills, 3 Cir., 200 F.2d 542 (1952).

12. And see N. L. R. B. v. Puerto Rico Rayon Mills, Inc., 1 Cir., 293 F.2d 941, 947 (1961); National Labor Rel. Board v. Grieder Mach. T. & D. Co., 6 Cir., 142 F.2d 163 (1944).

### III.

■ The union's next contention is that the evidence does not show that the guarantee demanded would violate § 8(e) and therefore coercion to obtain it would not violate subsection (A). The law on subcontracting clauses under § 8(e) is still in a state of flux. The Board has held that a contract which prohibits *all* subcontracting is legal as a legitimate device to protect the economic integrity of the bargaining unit.[13] The Board has also held, and we recently affirmed,[14] that contracts which limit subcontracting to employers having a contract with the same union are illegal. The Board found here that the guarantee was illegal in that it would have limited subcontracting to employers having a contract with Local 484. The union contends that the guarantee merely required maintenance of equivalent working conditions.[15]

The evidence on the terms of the guarantee is conflicting. Practically every witness expressed it somewhat differently. The executive secretary of the employers' association at the time the guarantee was originally given testified that the first carrier hired did not have a contract and was not required to execute one. Phillips, however, testified that the original carrier had a contract and that a contract was required. We conclude there was substantial evidence, viewing the record as a whole, to support the Board's conclusion that the guarantee required a union contract.

### IV.

The union further contends that the Board erred in its application of subsection (B) to the events at Continental. The Board opinion, in pertinent part, states:

"* * * With respect to the inducement of Continental's employees, Respondent concedes that it was seeking to compel Continental either to reinstitute the guarantee, or to have its delivery services performed in accordance with its own contract with Respondent Union. It is obvious, that the alternative avenue of conduct left open to Continental would require a cessation of business with Sunrise. It is therefore apparent that an object of Respondent's conduct was to force Continental to cease doing business with Sunrise. [Citing Local 1976 United Brotherhood etc., Carpenters' Union v. Labor Board, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958), commonly known as the Sand Door case.] * * * "[16]

The union contends that it has a "legitimate primary dispute" with Continental, and that the cessation of business with Sunrise is purely an incidental result, rather than an "object," of its activities.

■ The union never, however, states very clearly the exact nature of the "legitimate primary dispute" with Continental. It did not become a legitimate primary dispute simply because the union

---

13. Ohio Valley Carpenters District Council, etc., 136 N.L.R.B. 977 (1962).

14. District No. 9, International Ass'n of Machinists v. N. L. R. B., U.S.App.D.C., 315 F.2d 33 (1962).

15. The Board has not ruled upon the legality of contracts which limit subcontracting to employers maintaining working conditions equivalent to those in the bargaining unit but which do not require a union contract.

16. The Board also cited Highway Truck Drivers and Helpers, Local 107, etc., 131 N.L.R.B. 925 (1961), affirmed, sub nom. Highway Truck Drivers & Helpers, Local 107, etc. v. N. L. R. B., 112 U.S.App.D.C. 312, 302 F.2d 897 (1962). This citation suggests an alternative theory that every violation of subsection (A) constitutes a violation of subsection (B). See also Amalgamated Lithographers of America (Ind.), 130 N.L.R.B. 985 (1961), issue reserved, N. L. R. B. v. Amalgamated Lithographers of America (Ind.), 9 Cir., 309 F.2d 31, 43, n. 19 (1962); Teamsters Local Union No. 559, 138 N.L.R.B. No. 68, slip opinion p. 5 (1962); Local 282, International Brotherhood of Teamsters, 139 N.L.R.B. No. 92, slip opinion p. 13 (1962). This issue was not briefed or argued and we express no opinion thereon.

was attempting to obtain or enforce an agreement with Continental. Local 1976 United Brotherhood etc., Carpenters' Union v. Labor Board, supra; National Labor Relations Board v. Denver Bldg. Council, supra, Note 9. The union seems to suggest that it was only demanding compliance with the blanket no-subcontracting clause, which would be legal. This contention is refuted by the record, which clearly shows that the union was demanding not just a blanket no-subcontracting clause, but the cessation of business with non-complying subcontractors. We do not understand the Board order to prohibit the union in the future from demanding compliance with the no-subcontract clause. As we understand the Board's order, it only prohibits such a demand when it is used to compel Continental to interfere in the labor disputes of Sunrise. In other words, the union may not threaten Continental with enforcement of the blanket no-subcontracting clause in order to effectuate an arrangement whereby Continental will subcontract only with employers with whom the union has no labor dispute. Any such use of the clause would destroy the basic premise upon which subcontracting clauses, which *prima facie* violate subsection (B), are permitted, i. e., that the union is seeking to protect some legitimate economic interest of the employees of Continental, and not just using its position at Continental to enforce its demands against subcontractors.

The union argues that the demand for compliance with the written no-subcontract clause was not in fact tied to any illegal demand, that the record shows there was no dispute with Sunrise at the time. The argument is that if there is no current dispute with the subcontractor, the demand to end all subcontracting cannot be illegal. The short answer to this argument is that the record amply supports the finding of the Board that a current dispute did exist between the union and Sunrise, particularly over the union affiliation and work assignments.

## V.

Finally, the union contends that the scope of the Board's remedial order is too broad. The Board ordered Local 484 to cease and desist from:

"(a) Engaging in, or inducing or encouraging employees of Continental Baking Company, Oroweat Baking Co. of San Francisco, or any person engaged in commerce or in an industry affecting commerce to engage in a strike or a refusal in the course of their employment to perform any services, or threatening, coercing or restraining the aforesaid employers by strike or refusal to perform services, where an object thereof is forcing or requiring Continental Baking Company, Oroweat Baking Co. of San Francisco, or any other person to cease doing business with Clifford L. Aksland, d/b/a Sunrise Transportation."

The union objects to the inclusion of the words "any other person" since it was not shown that any companies except Continental and Oroweat were ever involved. The order limits its prohibition to conduct aimed ultimately at Sunrise. So limited, it is clearly proper.[17]

The order of the Board is

Enforced.

---

17. " * * * To confine the order solely to secondary pressure through Giorgi or Deltorto [the secondary employers involved in the proceeding] would leave Langer [the primary employer] and other employers who do business with him exposed to the same type of pressure through other comparable channels. The order properly enjoins petitioners from exerting this pressure upon Langer, through other employers, as well as through Giorgi and Deltorto. We may well apply here the principle stated in International Salt Co. v. United States, 332 U.S. 392, 400 [68 S.Ct. 12, 17, 92 L. Ed. 20]: 'When the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed.' * * * " International Brotherhood etc., Electrical Workers v. Labor Board, 341 U.S. 694, 705–706, 71 S.Ct. 954, 960, 95 L.Ed. 1299 (1951).