335 F.2d 326
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
MILK WAGON DRIVERS' UNION, LOCAL 753, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, and Peter Smith, its Agents, Respondents.
 No. 14420.
 United States Court of Appeals Seventh Circuit.
 August 3, 1964.
 
 Marcel Mallet-Prevost, Asst. Gen. Counsel, Hans J. Lehmann, Atty., National Labor Relations Board, Washington, D. C., for petitioner; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Asst. Gen. Counsel, Melvin J. Welles, Attys., National Labor Relations Board (on the brief).
 William T. Kirby, Chicago, Ill., James T. Griffin, Chicago, Ill. (on the brief), for respondents.
 Before HASTINGS, Chief Judge, and KNOCH and KILEY, Circuit Judges.
 KILEY, Circuit Judge.
 
 
 1
 The question raised is whether the NLRB was justified in deciding that respondents,[1] Milk Drivers' Union, Local 753, and Smith, business agent of the Local, were guilty of unfair labor practices under § 8(b) (4) (i) and (ii) (A)[2] of the National Labor Relations Act, as amended,[3] by "striking" and "threatening" to force Sidney Wanzer & Sons, Inc., to interpret their collective bargaining contract to prohibit the contracting out of hauling except to employers whose employees were members of Local 753, an agreement prohibited by § 8(e);[4] and under § 8(b) (4) (i) and (ii) (B)[5] of the Act by forcing Wanzer to disrupt an existing relationship with the Pure Milk Association.[6] We think that the record as a whole gives substantial support to the Board's decision and that the Board's order should be enforced.[7]
 
 
 2
 In 1961 a labor agreement between Wanzer and the Union was entered into and contained the following provision, which all interested agree is literally valid:
 
 
 3
 Article 44 . . . the transportation division shall not be reduced from its present status and immediate steps shall be taken to restore our members' jobs in all other plants covered by this agreement.
 
 
 4
 At that time Wanzer, a Chicago dairy, was buying milk from PMA, f. o. b. various points in Wisconsin. The milk was transported by Stonehouse, a Chicago hauling contractor, in tank-trucks driven by eight members of Local 753 to Wanzer's Chicago plant. Early in 1962, while Wanzer and PMA were negotiating a new contract for the sale of milk to Wanzer, f. o. b. Wanzer's Chicago plant, Wanzer terminated its hauling contract with Stonehouse. PMA and Wanzer made their agreement effective May 15, 1962, and PMA made a related agreement with Quality Carriers, a Wisconsin hauling contractor, to haul the milk to Chicago. Quality's drivers were members of Local 43, a Wisconsin union, an affiliate, with Local 753, of the same International.[8]
 
 
 5
 Local 753 interpreted Wanzer's action as a reduction of the "transportation division" in violation of Article 44 of the collective bargaining agreement, and demanded that Wanzer have its milk transported by members of Local 753, whether through Stonehouse, another independent contract hauler, or by Wanzer employees. Wanzer responded with compromise offers to the Union, PMA and Quality, without success. And strike threats made previously grew into a strike which was enjoined by the district court upon complaint of the Board's General Counsel.
 
 
 6
 The Trial Examiner found that Wanzer and Stonehouse were co-employers of the eight Local 753 members displaced by the termination of Stonehouse's hauling contract, and that Wanzer's action was a reduction of its "transportation division" in violation of Article 44 which he found to be a "work preemption" clause.
 
 
 7
 The Board, while adopting most of the Examiner's fact findings, did not deem it necessary to decide whether Stonehouse and Wanzer were co-employers or separate entities. It found that one of the objects of the Union's broadened interpretation of Article 44 was to prevent Wanzer from contracting out the hauling except to an employer whose employees were Local 753 members; that such a contract condition is violative of § 8(e) of the Act; and that by threatening to strike, and by striking, to compel Wanzer to enter into an agreement proscribed by § 8(e), the Union committed an unfair labor practice in violation of § 8(b) (4) (i) and (ii) (A) of the Act. The Board also found that a "further object" of the Union's action was to compel Wanzer to disrupt an existing business relationship with PMA because it had engaged Quality, whose drivers did not belong to Local 753, to haul milk to Wanzer's Chicago plant; and that this attempt to disrupt an existing business relationship is a "cease doing business" object within the meaning of § 8(b) (4) (B) of the Act.
 
 
 8
 There is no credibility question which prevented the Board from making findings different from those of the Examiner on the evidence that is not in conflict. Our function, therefore, is limited to determining whether the record as a whole supports the Board's findings.
 
 
 9
 We think the Board was justified in deciding that the Union's conduct following their demands under their "broadened interpretation" of Article 44 constituted unfair labor practices; and that the Union threatened to, and did, strike, because Wanzer could not, or would not, continue to have the eight displaced Union men drive the tank-trucks hauling the milk. The Board could also reasonably infer that to accede to the Union demands would be forcing Wanzer to disrupt, or cease, a business relationship with PMA; that the Union knew or should have known that this would be a necessary result of the demands; that accordingly the Union's conduct was unlawful under § 8(b) (4) (i) and (ii) (B); and that in striking to enforce Article 44, as interpreted by it, the Union was forcing Wanzer to condition whatever means were to be used to transport the milk on employment of Local 753 members, an unfair labor practice under § 8(b) (4) (i) and (ii) (A). District No. 9, Int'l Ass'n of Machinists v. N. L. R. B., 114 U.S.App.D.C. 287, 315 F.2d 33 (1962). We are unable to say these inferences are clearly erroneous.
 
 
 10
 Neither can we say that, on those findings, the Board could not reasonably conclude that one of the objects of the Union's conduct was to force a disruption of the business relationship among Wanzer, PMA and Quality. N. L. R. B. v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 688, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). Less than a total cessation of an existing business relationship is within the meaning of "cease doing business" in § 8(b) (4) (B). Local 3, Int'l Bhd. of Elec. Workers, 140 N.L.R.B. 729, 730 (1963), enforced, 325 F.2d 561 (2d Cir. 1963). The inference is warranted that the Union, virtually, exerted pressure on Wanzer to break its contract with PMA that the milk be delivered f. o. b. Chicago unless Quality's drivers were members of Local 753. It follows that we must disagree with the Union's contention that it had not committed an unfair labor practice because it was not asking Wanzer to cease doing business with anybody, not asking Wanzer to buy milk from anybody but PMA at any time, but only asking Wanzer to live up to its agreement.
 
 
 11
 The conclusion is not erroneous that the Union's interpretation of Article 44 would be an activity secondary in nature and within the proscription of § 8(e). Bakery Wagon Drivers Union v. NLRB, 116 U.S.App.D.C. 87, 321 F.2d 353 (1963), District No. 9, Int'l Ass'n of Machinists v. NLRB, 114 U.S.App.D.C. 287, 315 F.2d 33 (1962), Los Angeles Mailers Union v. NLRB, 114 U.S.App. D.C. 72, 311 F.2d 121, 124 (1962). The Union contends that Article 44 is a valid "work preemption" agreement which it had the right to demand and enforce. However, it is the Union's broadened interpretation of Article 44, conditioning, while not forbidding, Wanzer's right to subcontract, and not Article 44 literally, which the Board found unlawful. And if Article 44 had the meaning contended for by the Union, in itself it would be prohibited under § 8(e), and any attempt to have it enforced by the Union would have constituted an attempt to "enter into" it within the meaning of § 8(b) (4) (A). District No. 9, Int'l Ass'n of Machinists v. NLRB, 114 U.S. App.D.C. 287, 315 F.2d 33, 35 (1962), Los Angeles Mailers Union v. NLRB, 114 U.S.App.D.C. 72, 311 F.2d 121, 123-24 (1962). There is no merit therefore in the Union's contentions that it was unconcerned about Wanzer's business with PMA, that its objective was the lawful one of keeping its members in jobs, and that it was only trying to have Wanzer perform its obligations under Article 44. It is well settled that one unlawful object is sufficient for a finding that § 8(b) (4) has been violated, although there might be other lawful objects. NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).
 
 
 12
 The record as we decide gives substantial support to the Board's findings of the Union's unlawful objectives — to forbid contracting out of hauling except to employers whose employees were members of Local 753, and to compel Wanzer to disrupt an existing business relationship with PMA because Quality's drivers were not members of Local 753. We cannot say therefore that the Board should have decided whether Wanzer and Stonehouse were co-employers; or should have considered the Union's contentions that Wanzer was, in effect, a "primary employer" within the meaning of the proviso to § 8(b) (4) (B), or an "ally" with Stonehouse. The substantial evidence supporting the Board's conclusion that the Union exerted pressure on Wanzer to force it to disrupt an existing business relationship with PMA unless Quality employed drivers who were members of Local 753 distinguishes NLRB v. Local 825, Int'l Union of Operating Engineers, 326 F.2d 218 (3d Cir. 1963), and justifies the inference that the pressure was exerted "for reasons not strictly germane to the economic integrity of the principal work unit," District No. 9, Int'l Ass'n of Machinists v. NLRB, 114 U.S.App.D.C. 287, 315 F.2d 33, 36 (1962), and constituted a secondary activity outlawed by § 8(b) (4) (i) and (ii) (B).
 
 
 13
 For the reasons given, the petition to enforce the order is granted.
 
 
 
 Notes:
 
 
 [1]
 We shall refer to respondents hereafter as the "Union," or "Local 753."
 
 
 [2]
 "Unfair labor practices
 * * * * *
 "(b) it shall be an unfair labor practice for a labor organization or its agents —
 * * * * *
 "(4) (i) to engage in * * * a strike * * *; or (ii) to threaten, coerce, or restrain any person engaged in commerce * * * where * * * an object thereof is —
 "(A) forcing or requiring any employer * * * to enter into any agreement which is prohibited by subsection (e) of this section;
 "(B) forcing or requiring any person * * * to cease doing business with any other person * * * Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing." 29 U.S.C. § 158(b) (4) (1963 Supp.).
 
 
 [3]
 29 U.S.C. § 151 et seq
 
 
 [4]
 "It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement * * * whereby such employer ceases or refrains or agrees to cease or refrain * * * or to cease doing business with any other person * * *." 29 U.S.C. § 158(e) (1963 Supp.)
 
 
 [5]
 See note 2,supra.
 
 
 [6]
 A cooperative association of approximately 12,000 dairy farmers. Referred to hereafter as "PMA."
 
 
 [7]
 The Board's Decision and Order are reported at 141 N.L.R.B. 1237 (1963)
 
 
 [8]
 International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America