NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

JOINT COUNCIL OF TEAMSTERS NO.
38, Teamsters Union, Local No. 87, et al.,
and Arden Farms Co., et al., Respondents.

No. 18952.

United States Court of Appeals
Ninth Circuit.

Oct. 29, 1964.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin J. Welles, Gary Green, Attys., N.L.R.B., Washington, D. C., for petitioner.

Robert LeProhn, Stewart Weinberg, LeProhn & LeProhn, San Francisco, Cal., for respondents, Joint Council of Teamsters No. 38, etc.

Edward H. Moore, St. Sure, Moore, Corbett, Oakland, Cal., for certain employer respondents.

Before ORR, HAMLEY, and BROWNING, Circuit Judges.

BROWNING, Circuit Judge.

The National Labor Relations Board petitions for enforcement of its order directed against certain provisions of respondents' collective bargaining agreement, which the Board held [1] to be in violation of section 8(e) of the National Labor Relations Act.[2]

I

The first of the challenged provisions, article 5, section 1, provides that each respondent employer "agrees to refrain from doing business with any person engaged in the distribution of fluid milk or ice cream products who has not executed this agreement."

Respondents contend that the agreement embodied in section 1 of article 5 is not forbidden by the language of section 8(e), and, moreover, that it is not the kind of agreement which Congress intended to prohibit.

A.

Respondents' argument based upon the statutory language begins with a division of section 8(e) of the Act into two parts —the first prohibiting an agreement by an employer to "cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer"; the second prohibiting an agreement by an employer to "cease doing business with any other person."

1. Respondents contend that the first of these prohibitory clauses is inapplicable to section 1 of article 5 for two reasons. First, they assert that the phrase

---

[1] The Board's decision and order are reported at 141 N.L.R.B. 341. The Board's petition for a temporary injunction pursuant to § 10(l) of the Act, 29 U.S.C.A. § 160(l), was granted in part and denied in part. Hoffman v. Joint Council of Teamsters, 230 F.Supp. 684 (N.D.Cal. 1962).

[2] Sec. 8(e) of the Act, 29 U.S.C.A. § 158(e), reads:
"It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: Provided, That nothing in this subsection (e) shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: Provided further, That for the purposes of this subsection (e) and Section 8(b) (4) (B) of this section the terms 'any employer', 'any person engaged in commerce or an industry affecting commerce', and 'any person' when used in relation to the terms 'any other producer, processor, or manufacturer', 'any other employer', or 'any other person' shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: Provided further, That nothing in this Act shall prohibit the enforcement of any agreement which is within the foregoing exception."

"any person" in this provision of their contract refers to individual truckers who have no employees, and argue that an agreement to refrain from doing business with such individuals is not an agreement to refrain from dealing in the products "of any other *employer*." Second, they assert that the milk products involved are those of the respondent employer, and argue that there is thus no agreement to refuse to handle the products "of any *other* employer."

■ As to respondents' first contention, the record before the Board contained uncontradicted testimony that at least six to eight independent distributors doing business within the area affected by the collective bargaining agreement were in fact employers. The Board could properly conclude that the unqualified language of section 1 of article 5 applied to these distributors.

■ As to respondents' second contention, we think the rationale of National Labor Relations Board v. Servette, Inc., 377 U.S. 46, 84 S.Ct. 1098, 12 L.Ed. 2d 121 (1964), requires that the term "products of any other employer" in section 8(e) be read to include services furnished by an employer performing a distribution function.[3] This conclusion is implicit in National Labor Relations Board v. Milk Wagon Drivers' Union Local 753, 335 F.2d 326 (7th Cir. 1964). See also Bakery Wagon Drivers and Salesmen Local Union No. 484 v. National Labor Relations Board, 116 U.S.App. D.C. 87, 321 F.2d 353 (D.C.Cir. 1963); Highway Truck Drivers & Helpers Local 107 etc. v. National Labor Relations Board, 112 U.S.App.D.C. 312, 302 F.2d 897 (1962).

As the Supreme Court pointed out in Servette, "a primary target of the 1959 amendments was the secondary boycotts conducted by the Teamsters Union, which ordinarily represents employees not of manufacturers, but of motor carriers." 377 U.S. at 55, 84 S.Ct. at 1104. Section 8(e) would fall short of achieving its purpose if the Teamsters Union and a trucking company could agree with impunity that the latter would not interchange traffic with a non-union trucking company, on the theory that the latter's transportation service was not a "product." Both Congressman Landrum and Congressman Griffin pointed to this type of agreement as illustrative of the wrong which Congress sought to remedy.[4]

As noted in Servette, such terms as "produced" and "production" are commonly used in legislation to apply to the distribution of goods. 377 U.S. at 55–56, 84 S.Ct. 1098. The legislative history of section 8(e) is replete with references indicating that Congress meant to include all forms of economically productive effort within the term "product."[5] Moreover, the language of the second clause of section 8(e) plainly includes services, and there is nothing in the legislative history to indicate that Congress intended the application of the two clauses to differ in this respect.

■ 2. Even if the first clause of section 8(e) were inapplicable, section 1 of article 5 of respondents' contract would fall within the language of the second prohibitory clause. Respondents' contention to the contrary is premised upon the fact that the second clause of section 8(e) applies only to agreements "to cease" doing business, whereas sec-

---

3. We recognized in Great Western Broadcasting Corp. v. National Labor Relations Board, 310 F.2d 591, 595 (9th Cir. 1962), that the term "product" may be construed to encompass services rendered, but thought (erroneously, as the Supreme Court held in Servette) that the context of § 8(b) (4) of the Act required a narrower reading. These contextual factors are not present in § 8(e).

4. II Legislative History of the Labor Management Reporting and Disclosure Act of 1959, 1519(1), 1568(2) [hereinafter cited Leg.Hist.].
   Congress was assured that agreements not to deal with a transportation company were within the Act. II Leg.Hist. 1589(1–2), 1618(1–2).

5. See, e. g., II Leg.Hist. 1555–56 (distribution for a poultry processor; purchasing from a poultry dealer; retailing of dairy products) and 1196(3), 1518(3)–1519(1), 1568, 1707(3) (transporting merchandise by common carrier).

tion 1 of article 5 is an agreement "to refrain" from doing business. Respondents offered evidence that the parties intended this contract provision to apply only to future arrangements, and that no respondent-employer had been required to terminate existing arrangements with distributors.

Some commentators have accepted the distinction which respondents draw,[6] but most have rejected it.[7] We are satisfied that the latter position is correct. The legislative history offers compelling evidence that Congress intended no difference in meaning in its use of "cease" and "cease and refrain" in the two prohibitory clauses of section 8(e).

Section 8(e) originated in a floor proposal, offered by Senator Gore, prohibiting agreements by unions and common carriers by which the latter agreed to "cease or refrain from handling or transporting any of the products of any other employer." Senator McClellan expressed concern that this language might be circumvented by an agreement to refuse to do business with another employer. Such an agreement would effectively stop the transportation of that employer's products, but would not fall literally within the description of an agreement to stop "handling or transporting" those products. To meet this problem, Senator McClellan suggested the addition of the

language, "or to cease doing business." The amendment was accepted.[8] Thus, the second prohibitory clause of section 8(e) was added for the sole purpose of avoiding a possible subject-matter limitation upon the agreements prohibited. Nothing in the legislative materials suggests that either House intended to limit the reach of this broadened, "catch-all" clause to agreements affecting existing business relationships.

"Cease" and "refrain" are commonly treated as synonymous,[9] and were so used throughout the legislative proceedings. When Senator McClellan suggested the addition of the second clause, Senator Gore twice restated the section as it would read after amendment, and each time used "cease" *and* "refrain" in both clauses.[10] The word "refrain" was omitted from the second clause in the final printing of the Senate bill. This version was copied in later bills without comment on the omission, and, it may be fairly assumed, with no intention that the omission be accorded greater significance in the application of section 8(e) by the courts than it was accorded during the consideration of the section by Congress.[11]

We conclude that section 1 of article 5 falls within the language of section 8(e) of the Act.

---

6. Previant, 48 Geo.L.J. 346, 354 (1959); Comment, 45 Cornell L.Q. 724, 749 (1960).

7. See, e.g., Comment, 62 Mich.L.Rev. 1176 (1964); Comment, 38 N.Y.U.L.Rev. 97, 105 (1963); Comment, 71 Yale L.J. 158, 169 n. 57 (1961).

8. II Leg.Hist. 1162–63.

9. Webster's New International Dictionary (2d ed.), Merriam Co., 1959; Webster's Third New International Dictionary, Merriam Co., 1961; Funk & Wagnalls New Standard Dictionary, 1952.

10. II Leg.Hist. 1162–63.

11. The legislative history of § 8(b) (4) (B) offers further evidence that "cease" and "refrain" in the two clauses of § 8(e) are to be treated as synonymous:

The first clause applies to agreements to boycott an "employer," which, under the definition of that term in § 2 of the Act, 29 U.S.C. § 152, excludes railroads, political subdivisions, non-profit hospitals, and agricultural operations, among others. However, the second clause applies broadly to any "person," which would include the employers excluded from the narrow statutory definitions. Prior to 1959, § 8(b) (4) (B) used only the term "employer." The loophole which the narrow definition of this term created was corrected in the 1959 amendments. However, unless the two clauses of § 8(e) are given equal scope, the "employer" loophole which Congress was at pains to close in § 8(b) (4) (B) will have been introduced in § 8(e) by the same amendatory statute. See Comment, 38 N.Y. U.L.Rev. 97, 107 (1963).

### B.

Respondents' legislative-purpose argument runs as follows: Section 8(e) was intended to reach only agreements of the "hot cargo" variety, which bind a neutral employer to boycott another employer with whom the union has its real dispute. Such agreements are banned because they bring unfair pressure upon the employer having a dispute with the union, involve neutral employers and employees in labor disputes not their own, and spread labor disputes from their primary situs. Section 1 of article 5 is not such an agreement, but rather prohibits subcontracting of bargaining unit work to outside employers to protect the job opportunities of the employees of the signatory employers. Since its purpose is to provide job protection, and not to bring pressure to bear upon other employers to affect their labor policies, the contract provision is primary in nature and does not fall within section 8(e)'s ban on secondary boycotts.

■ We agree that section 8(e) is not to be applied literally to prohibit all union-employer agreements limiting subcontracting. More particularly, an agreement which restricts subcontracting to protect the job opportunities of the employees of a signatory employer, and not to apply secondary pressure upon third-party employers, may be beyond the purpose of section 8(e) and excepted from its proscription.[12]

■ But section 1 of article 5 of respondents' contract does not fall within this exception. Subcontracting is permitted if the third party has signed a union contract, prohibited if he has not. Whether the pressure of a boycott by a signatory employer will be applied to a third party depends entirely upon the latter's relationship with the union. The thrust of this boycott agreement is secondary, and the provision is therefore contrary to the purpose as well as the letter of section 8(e). Meat and Highway Drivers Local Union No. 710 v. National Labor Relations Board, 335 F.2d 709, 717 (D.C.Cir. 1964); Truck Drivers Union Local No. 413 etc. v. National Labor Relations Board, 334 F.2d 539, 548 (D.C. Cir. 1964); Dist. No. 9, Int'l Ass'n of Machinists etc. v. National Labor Relations Board, 114 U.S.App.D.C. 287, 315 F.2d 33, 36–37 (1962); Comment, 62 Mich.L.Rev. 1176, 1193 (1964).

Respondents seem to argue that section 1 of article 5 falls within the exception to section 8(e) because it preserves the job opportunities of employees within the multi-employer bargaining unit by prohibiting subcontracting to any employer outside that unit.[13] But if this argument were accepted, the exception to section 8(e) would permit precisely what the section itself was intended to prohibit: an agreement by an employer to boycott another unless the latter entered into a union contract.

Since section 8(e) forbids the agreement itself "whether activated or in suspense" (Employing Lithographers of Greater Miami, Fla. v. National Labor Relations Board, 301 F.2d 20, 30 (5th Cir. 1962); see also Truck Drivers Union Local No. 413 etc. v. National Labor Re-

12. Meat and Highway Drivers Local Union No. 710 etc. v. National Labor Relations Board, 335 F.2d 709, 713–716 (D.C. Cir. 1964); Truck Drivers Local Union No. 413 etc. v. National Labor Relations Board, 334 F.2d 539, 548 (D.C.Cir. 1964); Orange Belt Dist. Council of Painters etc. v. National Labor Relations Board, 117 U.S.App.D.C. 233, 328 F.2d 534, 538 (1964); Dist. No. 9 Int'l Ass'n of Machinists etc. v. National Labor Relations Board, 114 U.S.App.D.C. 287, 315 F.2d 33, 36–37 (1962). See Farmer, 52 Geo.L.J. 392, 402–03 (1964); Comment, 62 Mich.L.Rev. 1176 (1964); Goshko, 41 U.Det.L.J. 1, 53–54 (1963); Comment, 38 N.Y.U.L.Rev. 97, 113–14 (1963); St.Antoine, 40 U.Det.L.J. 189, 206–07 (1962); Comment, 71 Yale L.J. 158, 168–70 (1961); Powell, Symposium on the Labor-Management Reporting and Disclosure Act of 1959, 897, 898 (Slovenko ed. 1961); Aaron, 73 Harv.L.Rev. 1086, 1119 (1960); Comment, 45 Cornell L.Q. 724, 749–50 (1960); Cox, 44 Minn.L.Rev. 257, 273 (1959).

13. Powell, Symposium on the Labor-Management Reporting and Disclosure Act of 1959, 897, 903–04 (Slovenko ed. 1961).

lations Board, 334 F.2d 539, 542 (D.C. Cir. 1964)), it would make no difference if there were no existing non-signatory concerns which might be affected by the boycott agreement. Here, however, the record disclosed that there were,[14] and that it was the union's intention to require them to sign the contract.[15] Since respondent employer-producers control most of the dairy products distributed in the area affected by the contract,[16] their agreement not to do business with independent contractors who did not adhere to the collective bargaining agreement would make resistance to union demands by the latter a practical impossibility. Section 1 of article 5 thus involves signatory employer-producers directly and decisively in the union's dispute with existing non-signatory distributors.

## II

Section 2 of article 5 of the collective bargaining agreement is a particulariza-tion of the general prohibition of section 1 with respect to the transfer of existing distribution routes. The employer agrees that he will not subcontract existing distribution "without the prior consent of the Union unless after such transfer, the work or services transferred will be performed by an employer who is, or prior to such transfer agrees to become, a signatory to this agreement." [17]

The difference between this provision and section 1 is that subcontracting to non-signatories is conditioned upon union consent rather than being barred absolutely. Limitation of the consent requirement to transfers to non-signatories gives the agreement a secondary character.

Respondents point to the fact that the General Counsel did not challenge the first sentence of section 2. They assert that this provision is indistinguishable in principle from the second

14. Products produced by respondent employers are distributed directly to consumers on about 250 retail routes, and 70 to 75 of these are served by independent distributors. Independent distributors are also responsible for "a limited amount" of wholesale distribution to retail outlets. Some respondent producers distribute their dairy products almost exclusively through such independent distributors.

15. During the last five years there has been a constant increase in the number of such distributors doing business in the area affected by the contract. Both union and employer witnesses testified that the union considered independent distributors not bound by the contract to be a threat to the union and its members, because respondent employer-producers were not required to assure such distributors, or their employees, a guaranteed work week, overtime pay, vacation benefits, pensions, and other advantages which the contract required respondent employer-producers to provide their own employees doing the same work. The employer witness testified that union representatives stated during collective bargaining that the union intended to secure the signatures of the independent contractors to the collective bargaining contract. The union witness testified, "We feel we want to have everybody in the

same competitive contract conditions." About half of the independent distributors in the area had in fact signed the contract at the time of the hearing before the examiner.

16. The employer witness acknowledged that the respondent employers processed "a majority" of the fluid milk distributed in the area affected by the contract, but "could not say by percentage"; the union witness placed the figure at 99% of all dairy products.

17. Sec. 2 of article 5 is set out in full below; legality of the initial, bracketed sentence was not challenged by the General Counsel:

"[In order to preserve the work and job opportunities of Route Drivers and Relief Route Drivers covered by this Agreement, the Employer agrees that he will not transfer a single route to a single truck, independent contractor distributor or a single truck owner operator employee without the prior consent of the Union.] The Employer further agrees that no route or portion thereof will be transferred without the prior consent of the Union unless after such transfer, the work or services transferred will be performed by an employee of an employer who is, or prior to such transfer agrees to become, a signatory to this Agreement."

sentence (as well as from other challenged provisions), and argue that for this reason the attack upon the second sentence must fail. We need not stop to consider the differences between the two provisions, the soundness of the General Counsel's justification for challenging one but not the other, or whether the Board might have considered the lawfulness of the provision not attacked by the General Counsel. Cf. Frito Co., Western Division v. National Labor Relations Board, 330 F.2d 458 (9th Cir. 1964). It is the function of the Board and the court to determine the legality of the provisions that are in issue, and the General Counsel's decision not to challenge other provisions is irrelevant to that problem.

Respondents suggest that the second clause of section 8(e) of the Act is inapplicable to section 2 of article 5 because the latter applies only to transfers between employers, and the "any other persons" language in the second clause of section 8(e) excludes employers. We think the context clearly indicates that the referent of "other" in the second clause of section 8(e) is not the primary employer of clause 1, but rather the contracting employer. This is necessarily so in the first clause. Moreover, in its amendments of section 8(b) (4) (B), Congress indicated its understanding

that "person" is to be read broadly to include employers.[18]

## III

Section 3 of article 5 of the agreement particularizes section 1 with respect to the subcontracting of new or additional distribution by respondent employers.[19]

■ Subsection (a) permits the subcontracting of new distribution when it will be performed by an employee of a signatory employer, and is invalid on its face for reasons we have discussed. Subsection (c), in itself, may also impose unlawful secondary pressures upon non-signatory distributors. But, in any event, section 3 as a whole is to be read in the light of section 1 of article 5 and the intention of the parties.[20] As we have said, section 3 is a particularization of the unlawful general agreement in section 1, rendering it more specific and creating limited exceptions to it. Whether or not exceptions (b) and (c) would violate section 8(e) as independent agreements, we need not decide. They are integral, dependent parts of the unlawful agreement and must fall with it.[21]

## IV

■ Section 4 of article 5 provides that hauling from a processing plant to

18. Note 11 supra. See also Plumbers etc., Local No. 298 A. F. of L. v. County of Door, 359 U.S. 354, 79 S.Ct. 844, 3 L.Ed. 2d 872 (1959); Local Union No. 25 of Intern. Broth. of Teamsters, etc. v. New York, N. H. & H. R. Co., 350 U.S. 155, 159–161, 76 S.Ct. 227, 100 L.Ed. 166 (1956); Great Northern Ry. Co. v. National Labor Relations Board, 272 F.2d 741 (9th Cir. 1959).

19. Sec. 3 of article 5 reads:
   "New or additional distribution of fluid milk or ice cream products shall not be performed by an independent contractor or owner operator employee without prior consent of the Union, unless said distribution is performed:
   "(a) by an employee of an employer who is signatory to this agreement; or
   "(b) by an independent contractor distributor who purchases at least two hundred (200) units for distribution per delivery day per route from a

source which is not signatory to this Agreement; or
   "(c) by an independent contractor distributor or owner operator employee who purchases products for distribution from another employer who is signatory to this Agreement."

20. As we have noted, there was evidence from which the Board could find an implied agreement that the union consent requirement in § 3 would be used to compel third party adherence to the union contract. Bakery Wagon Drivers and Salesmen Local Union No. 484 v. National Labor Relations Board, 116 U.S. App.D.C. 87, 321 F.2d 353, 358 (1963).

21. Cf. Truck Drivers' Union Local No. 413 v. National Labor Relations Board, 334 F.2d 539, 549 (D.C.Cir. 1964); Meat and Highway Drivers Local Union No. 710 etc. v. National Labor Relations Board, 335 F.2d 709, 717 (D.C.Cir. 1964).

a depot, federal government installation, or another processing plant, when not performed by employees subject to respondents' collective bargaining agreement, must be performed by persons operating under a collective bargaining agreement with a local of the Teamsters Union.

Since section 4 conditions subcontracting upon the union's relationship with the subcontractor rather than upon economic conditions in the bargaining unit, it is primarily in aid of the union's organizing efforts outside the bargaining unit, and is prohibited by section 8(e). Truck Drivers Union Local No. 413 v. National Labor Relations Board, 334 F.2d 539, 548 (D.C.Cir. 1964); National Labor Relations Board v. Milk Wagon Drivers' Union Local 753, 335 F.2d 326 (7th Cir. 1964); Bakery Wagon Drivers and Salesmen Local Union No. 484 v. National Labor Relations Board, 116 U.S.App.D.C. 87, 321 F.2d 353, 357 (D.C.Cir. 1963); Dist. No. 9, Int'l Ass'n of Machinists etc. v. National Labor Relations Board, 114 U.S.App.D.C. 287, 315 F.2d 33 (1962); Comment, 38 N.Y.U.L.Rev. 97, 114 (1963); Comment, 71 Yale L.J. 158, 168 n. 52 (1961).[22]

## V

Article 34 provides that respondent employers shall not order an employee to handle the products of, or serve, an employer who is engaged in a strike or lockout recognized by respondent unions, nor discipline or discharge an employee who refuses to do so.[23]

Article 34 is tantamount to an agreement that the employers will not deal with the struck plant.[24] Indeed, the "hot cargo" clause at which section 8(e) was primarily aimed usually took this form.[25] The Board properly held article 34 invalid. Truck Drivers' Union Local No. 413 v. National Labor Relations Board, 334 F.2d 539, 546, 547 (D.C.Cir. 1964); Los Angeles Mailers Union etc. v. National Labor Relations Board, 114 U.S. App.D.C. 72, 311 F.2d 121, 124–125 (1962); National Labor Relations Board v. Amalgamated Lithographers, 309 F.2d 31, 36, 40–41 (9th Cir. 1963); Employing Lithographers of Greater Miami, Fla. v. National Labor Relations Board, 301 F.2d 20, 28, 30 (5th Cir. 1962).

Respondents argue that article 34 should be read as if limited to a permissible agreement that employees will not be required to cross a picket line at the situs of a primary dispute.[26] This

22. Article 16, requiring respondent employers to have employees' uniforms "laundered by an establishment employing AFL-CIO help," is invalid under § 8(e) for the same reasons. In this court respondents have not contended otherwise.

23. Article 34 reads:
"Section 1.
"It shall not be a violation of this Agreement and it shall not be cause of discharge or disciplinary action for any employee to refuse to handle the products of or serve any individual, firm or corporation while such individual, firm or corporation is under lockout, or is under a strike recognized by a Labor Council within the jurisdiction of Joint Council of Teamsters No. 38, by Local Union No. 381 or by Joint Council of Teamsters No. 38.
"Section 2.
"The Employer shall not order any employee to serve such individuals,

firms or corporations or handle their products."

24. Los Angeles Mailers Union etc. v. National Labor Relations Board, 114 U.S. App.D.C. 72, 311 F.2d 121, 124–125 (D.C. Cir. 1962); Comment, 38 N.Y.U.L.Rev. 97, 119 (1963); Comment, 62 Mich.L. Rev. 1176, 1183 (1964).

25. 71 Yale L.J. 158, 163 (1961); Farmer, 48 Geo.L.J. 327, 336 (1959); 45 Cornell L.J. 724, 739 (1960); Burstein, 11 N.Y.U.Annual Conf. on Labor 153 (1958); II Leg.Hist. 1007, 1079, 1197, 1708.

26. See, e. g., Truck Drivers' Union Local No. 413 v. National Labor Relations Board, 334 F.2d 539, 543–545 (D.C.Cir. 1964); Rothman, 45 L.R.R.M. 78, 85 (1960); Comment, 45 Cornell L.Q. 724, 747 (1960); Cox, 44 Minn.L.Rev. 257, 272 (1959).

contention was not made before the Board, and comes too late.[27] In any event, the Board's order enjoins respondents from giving effect to the contract provisions only "to the extent found unlawful herein," and the Board did not find article 34 unlawful to the extent that it may constitute a permissible "picket line" clause. If it were established that the parties so construed the clause, it would not be rendered unenforceable by the Board's order.[28]

27. Sec. 10(e) of the Act, 29 U.S.C.A. § 160 (e), provides " * * * No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. * * * " See National Labor Relations Board v. Amalgamated Lithographers, 309 F.2d 31, 44 n. 23 (9th Cir. 1963); National Labor Relations Board v. G. W. Thomas Drayage & Rigging Co., 206 F.2d 857, 860 (9th Cir. 1953).

28. See National Labor Relations Board v. Amalgamated Lithographers, 309 F.2d 31,

## VI

Respondents' constitutional attack upon section 8(e) has been rejected by this and other Courts of Appeals. Truck Drivers' Union Local No. 413 v. National Labor Relations Board, 334 F.2d 539, 549 (D.C.Cir. 1964); National Labor Relations Board v. Amalgamated Lithographers, 309 F.2d 31, 45 (9th Cir. 1962); Employing Lithographers of Greater Miami, Fla. v. National Labor Relations Board, 301 F.2d 20, 24 (5th Cir. 1962).

The Board's order will be enforced.

45 (9th Cir. 1962). Cf. Employing Lithographers of Greater Miami, Fla. v. National Labor Relations Board, 301 F. 2d 20, 28–29 (5th Cir. 1962). In view of the form of the Board's order in this case, we do not reach the question of whether our ruling in Amalgamated Lithographers, 309 F.2d at 41, is contrary in any respect to the decisions in Truck Drivers' Union Local No. 413 v. National Labor Relations Board, 334 F.2d 539, 549 (D.C.Cir. 1964), and Meat and Highway Drivers Local Union No. 710 etc. v. National Labor Relations Board, 335 F.2d 709, 717 (D.C.Cir. 1964).